EXHIBIT "E"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

PEGGY FARGANIS,

                        Plaintiff,

          -against-                    06-CV-5238

TOWN OF MONTGOMERY, DENNIS BARNETT,
MICHAEL TABACK, KENNETH BYRNES,
DANIEL THORSON, sued in their
individual capacities,

                        Defendants.
------------------------------------------------------X



                    Date:   July 26, 2007
                    Time:   10:25 a.m.
                    Place:  15 Railroad Avenue
                            Chester, New York


              DEPOSITION OF DENNIS BARNETT,

a Defendant in the above-captioned matter, held pursuant to

Agreement, at the above time and place, before Karen M.

Flemmig, Court Reporter, a Notary Public of the State of New

York.


-------------------------------------------------------------

              COURT REPORTING ASSOCIATES, INC.
                1699 Route 6; P.O. Box 113

                Carmel, New York   10512

                    (845) 225-0024



              COURT REPORTING ASSOCIATES, INC.

1                    DENNIS BARNETT

2       A    Just one, ma'am.

3       Q    Which one is that?

4       A    The rank of lieutenant.

5       Q    When was that rank added?

6       A    I believe it was a month and a half to two

7  months ago.

8       Q    In 2007?

9       A    That's correct, ma'am.

10       Q    Are you familiar with the Town of Montgomery

11  Police Department rules and regulations?

12       A    I am familiar, yes, ma'am.

13       Q    At some time during your employment by the

14  Town of Montgomery Police Department, did you receive a

15  copy of the rules and regulations of the police

16  department?

17       A    Yes, ma'am.

18       Q    When did you receive that, the rules and

19  regulations?

20       A    I don't know.

21       Q    Was it when you were first employed?

22       A    I don't think so, but I don't know.

23       Q    Sometime thereafter?

24       A    Yes, ma'am.

25       Q    Have you ever read the rules and regulations

1           DENNIS BARNETT

2    of the Town of Montgomery Police Department?

3         A    Yes, ma'am.

4         Q    Did you understand them?

5         A    Yes, ma'am.

6         Q    Do those rules and regulations require you, as

7    a police officer, to know the laws governing your

8    conduct as a police officer?

9              MR. MOROKNEK:  Note my objection as

10   to what the rules and regulations require.  The

11   rules and regulations speak for themselves.

12        A    Can you repeat the question, ma'am?

13        Q    Sure.  Do you know --

14             Are you required, as a police officer, to

15   know the laws governing your conduct as a police

16   officer?

17        A    Yes, ma'am.

18        Q    Sergeant Barnett, I'm showing you an exhibit

19   that's been marked Plaintiff's Exhibit 1.  I'm providing

20   a copy to your counsel.

21             Sergeant, have you had an opportunity to

22   inspect Plaintiff's Exhibit 1?

23        A    (Witness peruses document.)  Yes, ma'am.

24        Q    Can you identify this exhibit for me, please?

25        A    This is a copy, apparently, of the Town of

COURT REPORTING ASSOCIATES, INC.

1                    DENNIS BARNETT

2    Montgomery Police Department rules and regulations.

3         Q    Is this the document you were referring to in

4    your testimony a few minutes ago?

5         A    Yes, ma'am.

6         Q    You see the date of this document, at sort of

7    the lower right-hand corner, first page, dated September

8    7, 2000, "Adopted by resolution of the Town Board"?

9         A    Yes, ma'am.

10        Q    Does that refresh your recollection as to

11   approximately when you received a copy of these rules

12   and regulations?

13        A    It may have been sometime in the year

14   2000.  I don't recall.

15        Q    I'd like you to turn to page 10.  I'd like you

16   to look at paragraph three.  Do you see that paragraph,

17   "Conformance to Laws"?

18        A    Yes, ma'am.

19        Q    It says, "Department members shall obey all

20   laws of the United States and of any state and local

21   jurisdiction in which the officers are present."  Do you

22   see that?

23        A    Yes.

24        Q    Have you seen that before?

25        A    Probably when I first got them, ma'am.

1                    DENNIS BARNETT

2       Q    Do you understand paragraph three,

3    "Conformance to Laws," to be binding upon you as a

4    police officer for the Town of Montgomery?

5              MR. MOROKNEK:  Objection to the form

6    of the question.  You can answer.

7       A    Yes, ma'am.

8       Q    Turn to page 15, please.  I'd like you to look

9    at paragraph numbered 24, entitled "Courtesy."  Do you

10   see that?

11      A    Yes, ma'am.

12      Q    That reads, "Members of the department shall

13   be courteous to the public.  Officers shall be tactful

14   in the performance of their duties, shall control their

15   tempers and exercise the utmost patience and discretion

16   and shall not engage in argumentative discussions, even

17   in the face of extreme provocation.  In the performance

18   of their duties, officers shall not use coarse, violent,

19   or profane language or gestures and shall not express ay

20   prejudice concerning race, religion, politics, national

21   origin, lifestyle, or similar personal characteristics."

22             Do you see that, Sergeant?

23      A    Yes, ma'am.

24      Q    Do you consider paragraph 24 on page 15 to be

25   binding upon you as a police officer for the Town of

1       DENNIS BARNETT

2   Montgomery?

3       A    Yes, ma'am.

4       Q    Would you turn to page 37, please?

5       A    (Witness complies).

6       Q    Do you see a paragraph entitled "Other forms

7   of prohibited harassment"?

8       A    Yes, ma'am.

9       Q    Do you see that that reads, "Just as sexual

10  harassment is prohibited, so is harassment on the basis

11  of race, color, religion, creed, national origin,

12  citizenship, age, disability, pregnancy, marital status,

13  veteran status, or any other status protected by law"?

14      A    Yes.

15      Q    And you've read that before?

16      A    Yes, ma'am.

17      Q    Have you ever heard of the Americans with

18  Disabilities Act?

19      A    I've heard of it, yes.

20      Q    Do you understand what it means in lay terms?

21      A    Not totally, no, ma'am.

22      Q    What is your understanding of the Americans

23  with Disabilities Act?

24               MR. MOROKNEK:  Objection to the form

25  of the question and the question itself.  He's not

COURT REPORTING ASSOCIATES, INC.

1                    DENNIS BARNETT

2                    MS. ULLRICH:  He is an officer of the

3    Town of Montgomery.

4                    MR. MOROKNEK:  Right.

5                    MS. ULLRICH:  I'm asking him what his

6    understanding is of the Americans with Disabilities

7    Act.  It is a proper question.

8                    MR. MOROKNEK:  I understand.

9                    MS. ULLRICH:  Are you directing him

10   not to answer?

11                   MR. MOROKNEK:  Not yet.

12                   MS. ULLRICH:  Then I'd like him to

13   answer the question.

14                   MR. MOROKNEK:  I know what you'd

15   like.  Give me a minute.  Read back the question,

16   specifically, please.

17                   (Question read by reporter.)

18                   MR. MOROKNEK:  Kindly note my

19   objection to the form of the question.  You can

20   answer the question.

21       A    My understanding is that it's a law that

22   covers people with certain disabilities.

23       Q    Do you have any understanding as to what kind

24   of actions it prohibits with respect to persons with

25   disabilities?

1          DENNIS BARNETT

2     A     No, ma'am.

3     Q     Have you ever received any training as a

4     police officer in discriminating against people with

5     disabilities?

6     A     I don't recall so, ma'am.

7     Q     Have you ever received any training during

8     your employment by the Town of Montgomery in the issues

9     of discrimination against people because of certain

10    characteristics?

11              MR. MOROKNEK:  I'm so sorry.  Please

12    read that back.

13              (Question read by reporter.)

14    A     I believe I have.

15    Q     Describe the training that you have received

16    about discrimination.

17    A     I don't recall specifically what it was.

18    But I believe some was covered in the police

19    academy, and I believe in accordance with the Town

20    of Montgomery policies and procedures, there's

21    something in place that was read by me.

22    Q     When you say "police academy," what

23    institution are you referring to?

24    A     The police academy.  The academy which

25    trains police officers.  I couldn't recall what or

DENNIS BARNETT

1

2    Q    So you told Officer Byrne, B Y R N E, or

3    Byrnes, B Y R N E S?

4    A    With an S.

5    Q    You told Officer Byrnes to attend to the child

6    because he's an EMT?

7    A    That's correct.

8    Q    What did you tell Officer Thorson to do?

9    A    At, I believe, the same moment in time, or

10   shortly thereafter, Chief Byrnes informed me that

11   the driver of the vehicle, which I believe was a

12   van, was possibly impaired and was slurring her

13   words to where she could not answer his questions.

14        Once that information was retrieved, I

15   instructed Officer Thorson to stay with the driver

16   until we found out specifically what had happened.

17   I don't remember where the driver was, whether she

18   was still in the car, whether she was out of the

19   car.  I don't remember specifically where the people

20   were.

21   Q    What did you do after that?

22   A    The condition of the child was the primary

23   goal.  I basically got the totality of the

24   information that was retrieved.  Some of what the

25   witness saw, which was she said she saw the child

COURT REPORTING ASSOCIATES, INC.

1                    DENNIS BARNETT

2    fall out of the car.  Officer Byrnes was told to

3    give him treatment as much as humanly possible.  I

4    asked him the condition of the child.  The child was

5    extremely upset.  Mrs. Farganis was brought out of

6    the car, the person I know to be that, brought to

7    the back of the car, I don't specifically remember

8    how or if she was already out of the car.  And she

9    was interviewed as to what had happened.

10            Mrs. Farganis was severely upset because

11   of the number of red lights around her child.  She

12   stated her child had a seizure disorder or medical

13   disorder and could die at any moment.  She repeated

14   that phrase over and over and over again.

15            The first concern of mine after hearing

16   that was to get on the radio and advise the EMS unit

17   that that was, indeed, a possible life threat, and

18   they needed to step up their response so they could

19   deal with this child.  She kept repeating it, that

20   he could die at any moment.  He has a head injury.

21   If he hit his head, he could die at any moment.  EMS

22   was apprised of that, and Officer Byrnes was told of

23   that.  The responding medical units and fire units

24   that came after that were also told via him, and

25   they issued appropriate care.  After that, I spoke

1                    DENNIS BARNETT

2    with Officer Thorson, and we went over to speak with

3    Mrs. Farganis.

4         Q    Did you interview Mrs. Farganis?  You said she

5    was interviewed.  Did you interview her?

6         A    I don't remember who interviewed her.  I

7    don't remember what happened or who talked with her.

8    The information came out that her child had, in

9    fact, fell out of a moving vehicle, and he had a

10   seizure condition where if lights were around -- not

11   lights.  But if he were freaked out or scared

12   enough, he could die at any moment.  And a head

13   injury could do that to her son.  That was our

14   primary goal.

15        Q    Did you personally at that time speak with the

16   witness?

17        A    No, ma'am.

18        Q    You asked Officer Byrnes what the condition of

19   the child was?

20        A    Soon after, yes, ma'am.  It wasn't all in

21   the same.

22        Q    What did Officer Byrnes tell you about the

23   condition of the child?

24        A    I explained to him the condition I was

25   apprised of, and he took care of the care.  I spoke

1          DENNIS BARNETT

2    to Officer Byrnes about the care of the child after

3    the incident was over, not to say, "How is the kid

4    doing?"  His job was to deal with the child and

5    assist the medical personnel that was coming.  That

6    was his job.

7        Q    But you had time between the conversation or

8    receiving information from Mrs. Farganis that she was

9    very worried about her child and the time when the

10   ambulance arrived to call the ambulance and tell them to

11   hurry up; is that correct?

12              MR. MOROKNEK:  Objection to the form

13   of the question.  You can answer.  Do you understand

14   the question?

15              THE WITNESS:  No, I don't understand.

16       Q    You described that you received information

17   either from someone else or relayed from Mrs. Farganis

18   or from Mrs. Farganis herself that she was very worried

19   about her child, about the possible seizure disorder,

20   and concern that her child would have another seizure or

21   could die.  You received that information?

22       A    That's correct.

23       Q    You don't recall whether you received it from

24   Mrs. Farganis herself or from someone else?

25       A    That's true.

DENNIS BARNETT

2     far is that from Mike's Deli?

3          A     Ten, 12, 15 miles.

4          Q     Is it more likely that the Town of Montgomery

5     Ambulance Corps's ambulance came from the Scotts Corners

6     location?

7          A     I don't know their operating protocol,

8     ma'am.

9          Q     Are there personnel on duty at all times at

10    both locations?

11         A     They're volunteer, ma'am.  I don't know

12    their protocol.

13         Q     Once you assigned Officer Byrnes to attend to

14    the child and apprised him of the mother's concerns for

15    his physical well-being and you called the ambulance

16    corps to let them know of the mother's concerns, what

17    did you do next?

18         A     I interviewed the driver of the vehicle,

19    which I found out to be Mrs. Farganis.

20         Q     Tell me about that interview.  What did you

21    do?  What did you say?  What tests did you conduct?

22         A     Mrs. Farganis, when I saw her, was on the

23    back of the vehicle that she had apparently driven

24    and apparently the child had fallen out of.  I asked

25    her what happened.  She had extremely slurred words.

1    DENNIS BARNETT

2  She could barely stand.  I said, "Do you need to

3  sit?"  She said, "Yes."  She sat on the back bumper.

4          I asked her specific questions about her

5  driving and where she was driving to and from and

6  what happened.  I don't remember the specifics of

7  the answers she gave me.  She had severely slurred

8  words and was very, very upset.  She kept

9  reiterating, "My kid could die at any moment.  My

10 kid could die at any moment."  I said, "Ma'am, I

11 have EMTs and personnel treating your son.  What

12 happened here today?"

13          I don't know if Officer Thorson was

14 trained in standardized field sobriety.  But because

15 of the way she was slurring her words, she could

16 barely stand up, I asked her specific questions

17 about impairment, if she had any medical conditions,

18 if she was under the influence of any drugs, if she

19 took any drugs on a normal basis.

20          There was a point in time where she stated

21 that she did take some medication, and she told me

22 what that was.  I don't remember.  She also stated

23 that she had multiple sclerosis, and that that was

24 why she couldn't stand.  I asked her if there were

25 any restrictions on her license from a doctor saying

1

2     right now.

3          Q     So a normal, civil speaking tone?

4          A     She was highly upset.  She did not want

5     medical personnel looking at her child.  She did not

6     want the child looked at by anybody.  She kept

7     saying to me, "My child could die at any moment.  He

8     needs to go to a hospital.  He doesn't need to be

9     looked at by these people that are here," referring

10    to Officer Byrnes and the people that were attending

11    him.  I had to calm her down just to be able to

12    understand her.

13         Q     So it's your testimony that Mrs. Farganis

14    believed that her child was in mortal danger but did not

15    want medical personnel looking at him?

16         A     She kept saying to me she needed to be

17    with him so that medical attention could be bestowed

18    upon him.  That was the gist of what she kept

19    saying.  Not that she didn't want it, but that she

20    didn't want people looking at her kid alone.

21         Q     Did you take her over to her child so that she

22    could stand there while the medical personnel

23    administered care to him?

24         A     She was in the vicinity to oversee

25    everything that was done to her child.

1                    DENNIS BARNETT

2       Q    How far away from her child was she at this

3   point?

4       A    It wasn't that far.  The parking lot is

5   not that big.

6       Q    How deep is that parking lot?

7       A    I don't know.

8       Q    Approximately?

9       A    I don't know, ma'am.

10      Q    A couple hundred feet?

11           MR. MOROKNEK:  Objection to the form

12  of the question.  The pictures are here.  They speak

13  for themselves.

14      A    I don't know how big it is, ma'am.

15      Q    Did you at any time administer a field

16  sobriety test that required Mrs. Farganis to walk in a

17  straight line?

18      A    I administered the horizontal gaze

19  nystagmus test, and I administered another test.

20  I'm not sure if it was the walk-and-turn or the

21  one-leg stand.  She couldn't do it.  So I sat her

22  back down.  I did not want her to fall.

23      Q    Did she tell you that she couldn't do it

24  because of her MS?

25      A    She told me she couldn't stand.  That's

1                    DENNIS BARNETT

2    all she kept saying, "I cannot stand."

3        Q    Because of her MS?

4        A    She didn't say that specifically, ma'am.

5        Q    You knew she had MS because she told you that?

6        A    I don't know if it was prior to doing the

7    field sobriety test or after, but she did tell me

8    she had it, ma'am.  Yes, ma'am.

9        Q    Did you ever at any time ascertain she was not

10   under the influence of alcohol?

11       A    Absolutely.

12       Q    And she wasn't?

13       A    Not at that time, no, ma'am.

14       Q    Did you ascertain that she was not under the

15   influence of any illegal drugs?

16       A    At that point, yes, I made the

17   determination that she had a medical condition that

18   was causing the so-called apparent impairment that

19   was evident to people who had seen her.

20       Q    Did you ask her what medication she was

21   taking?

22       A    Yes.

23       Q    What medications was she taking?

24       A    I don't recall what she told me.

25       Q    Did you make any notation of the medication

1                          DENNIS BARNETT

2    weapon on her person.  I did not know, however, what

3    was in the vehicle.

4          Q     Did you ever personally speak with Velvet

5    Convoy?

6          A     I don't believe so, no, ma'am.

7          Q     Did there come a time when Mrs. Farganis was

8    placed in handcuffs?

9          A     Yes.

10         Q     Did you, yourself, personally apply the

11   handcuffs to her, or someone else?

12         A     One of my other officers applied the

13   handcuffs after the entirety of the circumstances of

14   the entire event was taken into consideration and it

15   was deemed probable cause to arrest her for

16   endangering the welfare of a minor.

17         Q     Did you order her to be placed in handcuffs?

18         A     When a person is arrested, ma'am, our

19   procedure is to handcuff the prisoner before they

20   get placed in the car.  Yes, ma'am.  She was placed

21   in handcuffs.  I don't know if I specifically said

22   to place them on her.  The totality of the

23   circumstances led me to believe, and conferring with

24   all the officers there, that the probable cause

25   existed for the arrest of endangering the welfare of

1                          DENNIS BARNETT

2      a minor, and she was arrested for that offense.

3          Q    When you placed her in handcuffs, were her

4      hands cuffed in front of her or behind her?

5          A    I don't remember where she was placed in

6      handcuffs, ma'am.

7          Q    Did you personally, Sergeant Barnett, do

8      anything to ascertain before Ms. Farganis was placed in

9      handcuffs that the handcuffs would not exacerbate her

10     disability?

11         A    Can you repeat that question, please,

12     ma'am?

13         Q    Did you personally do anything to ascertain

14     that putting Mrs. Farganis in handcuffs would not

15     exacerbate her disability, make it worse?

16         A    I don't understand what you're trying to

17     ask, ma'am.

18         Q    I'm asking if you did anything, if you found

19     out anything, if you talked to anybody, if you

20     determined that placing Mrs. Farganis in handcuffs

21     wouldn't make her disability worse, wouldn't worsen her

22     multiple sclerosis?

23         A    I had no information to that effect, no.

24         Q    Did you make any attempt to find out whether

25     it would or not?

1                    DENNIS BARNETT

2        A    No, ma'am.  I did not.

3        Q    You indicated earlier that it is police

4   procedure to place handcuffs on a person when that

5   person is arrested; is that correct?

6        A    Yes, ma'am.

7        Q    Is that Town of Montgomery police procedure?

8        A    That's Town of Montgomery police

9   procedure.  That's basic police procedure.  It's

10  also for the safety of the officer and the prisoner.

11       Q    Is that procedure written somewhere?

12       A    If it is, it's in our Town of Montgomery

13  police protocol.  It's also in many manuals, New

14  York State Police Manual.  It's in many manuals.

15            MS. ULLRICH:  I'm going to request

16  the production of the Town of Montgomery police

17  protocol.

18            (TOWN OF MONTGOMERY POLICE PROTOCOL

19                 requested by counsel.)

20            (Brief recess taken.)

21  BY MS. ULLRICH:

22       Q    How long were you, approximately, at Mike's

23  Deli?

24       A    I don't recall how long I was there.

25       Q    No recollection, whether it was a half an

COURT REPORTING ASSOCIATES, INC.

1                          DENNIS BARNETT

2    I don't believe I did.

3         Q    You never talked with him on the telephone?

4         A    I don't remember.

5         Q    Did you have any contact with Mrs. Farganis's

6    niece?

7         A    I may have.  If it wasn't me, maybe one of

8    my officers did.  I don't remember.  I don't recall.

9         Q    Do you recall that there was a niece involved

10   in this incident?

11        A    Yes.

12        Q    Do you recall seeing the niece?

13        A    I don't remember if I saw her directly.  I

14   know that after we -- before she was transported to

15   the station, Mrs. Farganis was taken to see her son

16   in the back of the ambulance.  And after that, I

17   believe I had spoken with her so a family member

18   could go to the hospital with the child.  We wanted

19   the mother to see the child so that, (A) the child

20   wouldn't be so upset, and, (B) that Mrs. Farganis

21   would calm down and know that her son was receiving

22   appropriate care.

23             She was then placed in the car, brought

24   back to the station.  And I don't know if the aunt

25   rode in the back of the ambulance or she went with