Farganis

you are receiving?  You receive a check from Social
Security Disability?

    A    Yes.

    Q    How frequently, once a week, once a month?

    A    Once a month.

    Q    And how much is that check?

    A    I receive one for $713.

    Q    $713?

    A    Right, and then I get one for my son for
$380.

    Q    So, you are bringing into the house about
$1,193 a month?

    A    Right.

    Q    And your husband who is doing housecleaning
on the weekends earns what, about what a month?

    A    It varies.

    Q    Okay.  Give me an average, if you can.

    A    One weekend he can make $190.  The
following weekend would be $175.

    Q    So, it depends for whom he is working?

    A    Right.

    Q    Tell me, why are you receiving Social
Security Disability?

    A    For my Disability, I have multiple

1                          Farganis

2  sclerosis.

3      Q     Ma'am, when were you first diagnosed as

4  having multiple sclerosis?

5      A     Sixteen years ago.

6      Q     How old were you at the time?

7      A     Twenty.

8      Q     Who diagnosed you?

9      A     Dr. Andreas.

10     Q     Where is Dr. Andreas located?

11     A     He was in Montgomery.  He diagnosed me in

12  Horton Hospital in Middletown.

13     Q     Okay.  We can agree that this incident that

14  we are here about today occurred on March 18, 2005?

15     A     Yes.

16     Q     Is that fair to say?

17     A     Yes.

18     Q     Before March 18, 2005, let's say from the

19  time of your 16th birthday or the time you were

20  diagnosed with MS, tell me what kind of issues you

21  were faced with as a person diagnosed with MS.  In

22  other words, what kind of symptoms did you exhibit

23  between the time of your diagnosis and March 18,

24  2005?

25     A     Weakness in my lower extremities.

Farganis

Q    I didn't hear the first word you said.

A    Weakness.

Q    Weakness, okay.  What else?

A    Tingling sensations, pins and needles.

Q    Where?

A    In my upper and lower extremities.

Q    What else?

A    When I was first diagnosed, I went completely blind in my left eye and I couldn't lift my right arm.

Q    So, is that why you went to the doctor in the first place?

A    Yes.

Q    Since your diagnosis, however, the blindness in your left eye has come back?

A    Yes.

Q    Completely?

A    Yes.

Q    Do you wear contacts or glasses at the present time?

A    No.

Q    Were you wearing contacts or glasses back in March of 2005 at the time of the incident?

A    No.

Farganis

Q    Okay.  What about your right arm, did your ability to lift your right arm come back since your diagnosis?

A    Yes.

Q    What other symptoms did you exhibit since your diagnosis up to March 18, 2005?

A    That's it, just the weakness.  The tingling sensation, pins and needles, and the blindness in the eye, no sensation or anything in my right arm.

Q    Tell me since your diagnosis up to March 18, 2005 did those symptoms get better, get worse, stay the same or something different and I know you told me a little bit already about that.

A    Well, with the blindness that went away. But the weakness just seems to increase every year.

Q    What about your speech?

A    My speech is slurred too.

Q    Has it always been slurred?

A    Probably for the past five years.

Q    Okay.  What about your walk, the way you walk, do you have a limp?  Do you favor one side over the other?

A    I favor my left side.  I do have a limp.  I cannot use -- when I use a cane I seem to trip over

1          Farganis

2    it.

3          Q      Do you have something called a foot drop

4    where you kind of drag one foot or the other?

5          A      Yes.

6          Q      Did you have that before March 18, 2005?

7          A      No.  Before March 18th, yes.

8          Q      Okay.  So, when you first were diagnosed

9    with MS you didn't have those particular symptoms.

10   You seem to develop those symptoms over time?

11         A      Right.

12         Q      As of March 18, 2005 the day of the

13   incident these were symptoms, the way you walked and

14   the foot drop and the slurred speech, those were

15   things that you had as of March 18, 2005?

16         A      Right.

17         Q      What other symptoms did you have as of

18   March 18, 2005 that we haven't spoken about yet?

19         A      My balance was completely off.

20         Q      What else, if anything?

21         A      Nothing.

22         Q      Okay.  Before March 18, 2005 had you spoken

23   to or consulted with a mental healthcare provider,

24   psychiatrist, psychologist or anybody like that?

25         A      No.

Farganis

A    Right.

Q    She may very well be a nice lady?

A    Right.

Q    Have you ever met her since the incident?

A    No.

Q    Have you spoken to her since the incident?

A    No.

Q    Do you know if your attorney has spoken to her since the incident?

A    No.

Q    She may very well be a nice lady?

A    Right.

Q    Dennis Barnett, we know who he is.  Other than the people that we have spoken about Dan, Jessica and Velvet, is there anybody else that you know of that is a witness to this incident?

A    No.

Q    Let's talk a little bit about March 18, 2005.  Okay, you were driving a car that day?

A    Right.

Q    What kind of car were you driving?

A    Actually, it was a conversion van.

Q    It was a who?

A    A conversion van.

Farganis

Q     What does that mean?

A     It means it has seats, a driver's seat,
passenger seat, then it has two seats behind it and
then it has a bench seat behind that.

Q     So, there are three rows of seating?

A     Yes.

Q     In the second row is what, two bucket
seats?

A     Right.

Q     You don't have any pictures of this car, do
you?

A     No.

Q     And in the third row you have a bench seat?

A     A bench seat.

Q     Okay.  How old was that car you were
driving?

A     Oh, it was a '95.

Q     And how many miles did it have on it, if
you know?

A     Probably 110.

Q     Okay, and how long had you been driving
that car, not that day, but just historically?  Did
you have it for five years, ten years, a year?

A     Five years.

Farganis

question. My question was, when you put Brett in the car that day were there car seats in the car?

A No.

Q Did you own car seats?

A Yes.

Q Remember, I told you earlier. It's very important that you listen to my question.

A Sorry.

Q We are getting into the meat of it right now. I need the record to be clear. Okay?

A Okay.

Q On March 18, 2005 did you or your husband own car seats?

A Yes.

Q How many car seats did you own?

A Two.

Q What kind of car seats did you own?

A One was a booster seat for Brett and the other one was a regular car seat.

Q When you say a regular car seat, you mean the kind you put an infant in, not an infant, between the ages of one and three or one and four or something like that?

A Right.

Farganis

Q     For more younger kids?

A     Right.  Actually, I am not sure what they are called.

Q     Where were those car seats on March 18, 2005?

A     In my car which was in the shop.

Q     When had you dropped off your car in the shop before Friday?

A     Friday morning.

Q     Okay.  When you dropped off your car in as soon as possible Friday morning how did you do that logistically?  How did that work?  You drove your car and your husband followed you?

A     No.

Q     How did that happen?

A     My father picked me up with his car and brought me home.

Q     Okay.  It's fair to say that you left the car seats in the '92 Pontiac Grand Prix in the shop?

A     Right.

Q     What was the shop?  By the way, where the car was being fixed, what was the name of the shop?

A     I forget the name of the shop but it was in Wallkill.

1                    Farganis

2       Q      It just opens?

3       A      My door would open.  One door opened to the

4    left and one door opened to the right.

5       Q      So, the car was a two-door conversion van,

6    is that right or wrong?  How many doors did the van

7    have on March 18, 2005?

8       A      It had the two in the front, two on the

9    side and the two in the back.

10      Q      So, two doors in the front?

11      A      So six.

12      Q      Two doors in front for the passenger and

13   the driver?

14      A      Right.

15      Q      There were two doors kind of on the body of

16   the van?

17      A      Right.

18      Q      Did they slide open?

19      A      No.

20      Q      How did they work?

21      A      They opened outward.

22      Q      I am pretty sure I asked you this question

23   before.  Do you have any pictures of this van?

24      A      No.

25      Q      Do you still have the van?

Farganis

A    Yes.

Q    They pulled open toward the outside?

A    Right.

Q    Okay.  Now, you said you put Brett in on the driver's side in the middle.  I am so sorry.  I don't know what you mean by that.  What does that mean?

A    I put him -- I opened the middle doors.

Q    You opened the middle doors?

A    The middle doors.

Q    On the passenger side or the driver's side?

A    On the passenger side.

Q    When you say you opened the passenger side middle doors is there more than one door?

A    Two.  One would open to the right and one would open to the left.

Q    In other words, one would open towards the back of the truck and one would open to the front of the truck?

A    Right, and I put him in and I put him in the seat behind the driver's seat.

Q    So, okay, I get it.  So, he was in the middle row in the seat directly behind the driver's seat?

1                      Farganis

2      A     Right.

3      Q    When you put him in the middle row directly

4 behind the driver's side did you have a conversation

5 with him about the fact that he was not in a child

6 protective seat of any kind?

7      A    I told him I did not have his car seat with

8 me so he had to stay in the seat belt and I put the

9 seat belt on him.

10     Q    Now, did you use anything behind or under

11 his bottom to raise him up a little bit?

12     A    No.

13     Q    When you put the seat belt on your son did

14 you lock the seat belt in?

15     A    Yes.

16     Q    And it was working on that day?

17     A    Yes.

18     Q    Okay.  As of March 18, 2005 did your son

19 know how to remove himself from the seat belt?

20     A    Yes.

21     Q    Before March 18, 2005 how many times had

22 your son sat in a regular seat belt that did not have

23 a car seat?

24     A    Never.

25     Q    That was the very first time?

Farganis

1

2     A     Yes.

3     Q     When you used the child seat belt for your

4  son in days past March 18, 2005 you would also use

5  the lap and harness seat belt in conjunction with

6  that booster, right?

7     A     Right.

8     Q     And the purpose of the booster was to get

9  him high enough so the seat belt didn't come around

10 his neck, right?

11    A     Right.

12    Q     So, it would be positioned properly, is

13 that fair to say?

14    A     Yes.

15    Q     It's fair to say that when you put him in

16 the seat on March 18, 2005 the seat belt was

17 obviously not positioned properly?

18    A     Correct.

19    Q     All right.  Did you make any attempts

20 before you left with your son that afternoon to call

21 the shop to find out if there was any way you can get

22 the car seats?

23    A     No.

24    Q     Okay.  All right, you put your son in the

25 car.  He was seat belted without a car seat.  You got

1                        Farganis

2     in the car.   Were you wearing your seat belt that

3     day?

4          A     Yes.

5          Q     And you started driving away?

6          A     Yes.

7          Q     You got on Route 208, right?

8          A     Yes.

9          Q     You traveled a period of time, is that fair

10    to say?

11         A     Yes.

12         Q     Did you make any stops before you got to

13    your mom's house?

14         A     Yes.

15         Q     Where did you stop?

16         A     He had asked me for McDonald's.

17         Q     So, you went to McDonald's?

18         A     Correct.

19         Q     Where was the McDonald's located?

20         A     On 208 in Montgomery.

21         Q     When you went to McDonald's on Route 208 in

22    Montgomery did you go to the drive-thru or did you go

23    into McDonald's?

24         A     Drive-thru.

25         Q     When you went to the McDonald's and you

Farganis

went through the drive-thru along Route 208 in
Montgomery did your son get out of his seat?

 A No.

 Q Did your son keep his seat belt on?

 A Yes.

 Q How do you know that?

 A Because he asked me for a Happy Meal and I
told him as long as he stays in his seat belt.

 Q Okay. So, you bought him a Happy Meal?

 A Right.

 Q And did that Happy Meal come with a toy
that day?

 A Yes.

 Q What was the toy?

 A I forget.

 Q You have to remember what the Happy Meal
toy was.

 A I forget.

 Q Okay. Is there anything at home or anyway
that might refresh your recollection as to what it
was?

 A I don't know if he still has it.

 Q Okay. So, you bought him the Happy Meal.
Did it come with a toy?

1                      Farganis

2      A      Yes.

3      Q      How do you know that it came with a toy?

4      A      Because Happy Meals always come with toys.

5      Q      Did he say anything about the toy, that he

6   wanted the toy?

7      A      Yes.

8      Q      So, you paid the lady or the man at the

9   McDonald's?

10     A      Yes.

11     Q      You took the bag?

12     A      Yes.

13     Q      Was it one bag or two?

14     A      One.

15     Q      What did you do with it?

16     A      I put it on the front seat.

17     Q      Next to you?

18     A      The passenger seat in the front seat.

19     Q      Okay.  You put your money away and I am

20  assuming you drove from McDonald's back onto Route

21  208?

22     A      No.

23     Q      What did you do?

24     A      I went from McDonald's to Good Will Road.

25     Q      All right.  You have to help me with that.

Farganis

When you got out of McDonald's did you make a right
or a left onto Good Will Road?

    A    A left.

    Q    Now, why did you go on Good Will Road
rather than back on 208?

    A    Because it was quicker to go to my parents
taking Good Will Road.

    Q    What was the distance from the McDonald's
to your parents' house taking Good Will Road?

    A    Five miles.

    Q    Okay.  That was also some kind of a
shortcut you were familiar with?

    A    Yes.

    Q    Having lived in that area your whole life
is it fair to say you were familiar with the roads?

    A    Yes.

    Q    You made a left onto Good Will Road.  You
traveled that road for how far before the incident
occurred?

    A    Maybe 200 feet.

    Q    Okay.  Now the incident occurred, as I
understand it, while the car was moving, right?

    A    Right.

    Q    What was the speed limit on Good Will Road

Farganis

2  in or about the area of the incident?

3     A     The speed limit was 30 miles per hour.

4     Q     Okay.  What's your best estimate of the

5  speed you were travelling at or about the time of the

6  incident?

7     A     Two to five miles an hour.

8     Q     Why were you going slowly?

9     A     I was leaving a stop sign and I was pulling

10  away from the stop sign.

11     Q     So, hold on.  Let's talk about it.  You

12  left McDonald's?

13     A     Right.

14     Q     You made a left onto Good Will Road?

15     A     Right.

16     Q     You drove for a period of time until you

17  came to a stop sign?

18     A     No.

19     Q     Tell me what you did.

20     A     The stop sign was at the end of -- Hawkins

21  Drive, that's the name of the road.

22     Q     Okay.

23     A     Between McDonald's and Good Will Road was

24  Hawkins Drive.  I was making a left off of Hawkins

25  onto Good Will.

1                       Farganis

2      Q    So, when you said you made a left onto Good

3   Will out of McDonald's, that wasn't completely

4   accurate?

5      A    Right.

6      Q    What you did was make a left out of

7   McDonald's, right, onto Hawkins Drive?

8      A    Right.

9      Q    You drove on Hawkins Drive for how long

10  until you made a left onto Good Will Road?

11     A    A mile.

12     Q    One mile?

13     A    Yes.

14     Q    What was the speed limit on Hawkins Drive?

15     A    30 miles per hour.

16     Q    Okay.  And you stopped at a stop sign on

17  Hawkins Drive.

18     A    Right.

19     Q    And at the stop sign you were making a left

20  onto Good Will Road?

21     A    Correct.

22     Q    Did the incident occur as you were making a

23  left onto Good Will Road?

24     A    Yes.

25     Q    As you made the left on Good Will Road from

Farganis

Hawkins Drive it's fair to say your foot was on the gas?

A    Right.

Q    You were accelerating into the turn, right?

A    Right.

Q    Okay.  To the best of your knowledge where was your son as you were making the turn?

A    In the seat with the seat belt on.

Q    But you learned that wasn't the case?

A    Right.

Q    When was your first notification or knowledge that your son was no longer in the seat with the seat belt on?

A    When he got out of his seat belt and he came in the front and said, I want my toy, and he reached over to get the bag, put his hand on the door handle.  The door opened up.  He fell out.

Q    Okay.  Let's bounce back for a minute.  My question was, when did you first realize your son was out of his seat?

A    When he asked me for his toy.

Q    Okay.  Was that before or after you stopped at the stop sign going from Hawkins Drive to Good Will Road?

Farganis

Q    Okay.  Did you make any attempt to pull the car over and stop the car?

A    Stop the car, I was going closer to the curb to pull over.

Q    But that never happened?

A    Right.  I did not stop it but I was headed towards the curb.  Do you understand what I am saying?

Q    No, not at all.

A    I was aiming for the side of the road.

Q    Why were you aiming for the side of the road?

A    Because he was out of his seat.  I was going to pull over and put him back in his seat.

Q    So, I get your story straight, what you are saying is when you saw your kid, your child, forgive me, Brett, come out of his car seat you looked in the rear view mirror and what was your intention?

A    To put him back in the seat belt.

Q    You were going to do that how?

A    Pulling the car over.

Q    But you didn't get a chance to do that, right?

A    No.

1      Farganis

2   underneath my arm to get in the front to get the bag.

3      Q     What do you mean, your arm was up?

4      A     I was turning.  My arm was like this.

5          MR. BERGSTEIN:  Outstretched?

6          THE WITNESS:  Right.

7      Q     Was it touching the other seat, the

8   passenger seat?

9      A     Yes.

10     Q     Why was your arm that way?

11     A     Because I wanted to try and block him from

12  getting in the front.

13     Q     Okay.  When you put your arm up in an

14  attempt to block him from getting in the front what

15  did he do?

16     A     He went underneath my arm, got to the

17  passenger seat in the front.

18     Q     He was actually seated in the passenger

19  seat?

20     A     No.  He grabbed his toy off of the seat,

21  the bag off of the seat.  He put his hand onto the

22  door, the passenger door.

23     Q     Right.

24     A     And he must have hit the handle to open the

25  door.  I don't know how and pushed the door open and

Farganis

he fell out.

Q    Where was his body positioned when he grabbed the bag from McDonald's?

A    It was leaning -- he was reaching on to the seat.

Q    My question is, was his body in the front of the car now?

A    Yes.

Q    Was it in the middle row of the car or someplace different?

A    In the front.

Q    His entire body was in the front of the car?

A    Right.

Q    He reaches over to his right, he grabbed the bag, and can you tell me logistically what happens? You say he must have hit the handle. Did you see a part of his body make contact with the handle?

A    I saw his arm go onto the door.

Q    Which arm?

A    The upper, his left arm.

Q    And then what did he do, the door opened?

A    The door opened.

1          Farganis

2   when you first learned he was out of his seat belt?

3       A     I didn't want to stop in the middle of the

4   road and cause an accident.

5             MR. BERGSTEIN:  You don't have to explain

6       it.

7       Q     I am asking yes or no.  You didn't stop the

8   car?

9       A     No.

10      Q     Tell me about traffic in that area.  You

11  made the left-hand turn from Hawkins to Good Will

12  because I am assuming there was no traffic on your

13  right coming from Good Will?

14      A     Correct.

15      Q     It's fair to say you made the left-hand

16  turn from Hawkins to Good Will because there was no

17  traffic coming from the left on Good Will?

18      A     There is a stop sign here.

19      Q     Indicating on Good Will for passenger -- I

20  am sorry, for cars coming from your left as you sit

21  on Hawkins, right?  Feel free.

22      A     I am trying to think.  You see, Good Will

23  comes up.  There is a stop sign here on Good Will

24  and there is a stop sign here on Good Will and here

25  is Hawkins right here.

Farganis

Q    Tell me what your speed was when the door opened and he fell out of the car.

A    Between two to five miles an hour.

Q    Okay.  At any time between the time he got out of his seat belt and he fell out of the car did you see him touch the handle to the passenger side door in the front?

A    No.

Q    Were the doors to the car locked when you started driving that day?

A    When I started driving that day, yes, they were.

Q    How do you know that?

A    Because they were electronic locks and I pushed the button down to lock them.

Q    How do you open the passenger side door while the car is moving if the door is locked?

A    I don't know.  I don't know how he did it or how it opened.

Q    When he got into the front seat and you saw his body in the front seat did you say anything to him?

A    I told him to get back into the seat.

Q    How did you say that?  Were you stern with

Farganis

You would be going, well, I guess I don't know. You
have to show me how that happened.

    A    The way the road is, Good Will is.

    Q    It's kind of a veer to the left more than
an actual left turn?

    A    No, it's a left turn.

    Q    Okay.  Does what you have drawn here look
like what you were driving on back in March of 2005?

    A    Yeah.

    Q    Okay.

    A    I pulled out of Hawkins onto Good Will.  I
made the left and as the door opened, I stopped
right there.  As soon as I pulled away, the door
opened, and I stopped right there.

            MR. BERGSTEIN:  There meaning the X?

            THE WITNESS:  Where the X is.

    Q    Please forgive me.  I don't see the X.

    A    On here.

            MR. MOROKNEK:  Let's make this Defendant's
        Exhibit A-1 and this is Defendant's Exhibit A-2.
        And you are saying that Defendant's Exhibit A-2
        you just draw where you made your turn and you
        stopped, right.

    Q    Is that fair to say?

Farganis

side.  I went through the passenger side door to go
to my son.  I made sure there was -- he was not
bleeding.  I felt for bumps on his head.

        Q    Did you see him hit his head?

        A    Well, I just figured that he probably hit
his head when he fell.

        Q    Ma'am, did you see him hit his head?

        A    No.

        Q    Did he tell you he hit his head?

        A    No.

        Q    Did you ask him what hurt?

        A    He was crying.

        Q    You would agree he was scared?

        A    Right.

        Q    Did you ask him if he was hurt?

        A    Yes.

        Q    What did he say?

        A    His head hurt.

        Q    What did you do?

        A    I felt his head for bumps and for blood,
any sign of blood.  There was none.

        Q    Okay.

        A    So, I put him back into his seat and I put
the seat belt back on him.  I called my -- I was

1      Farganis

2   still parked.  I called my niece.

3        Q     Hold on a second.  Are you telling me that

4   you put him back in the same car he just fell out of?

5        A     Yes.

6        Q     You put him back in the same seat he had

7   just released himself from?

8        A     Yes.

9        Q     Yes?

10       A     Yes.

11       Q     Did you have a cell phone in the car?

12       A     Yes.

13       Q     Please continue.  You said you called your

14  niece?

15       A     I got in the car.  After I seat belted him

16  in and I called my niece, told her what happened and

17  asked her if she would go to the hospital with me.

18  She told me where she was, that I could pick her up

19  there and that she would go with me to help me with

20  Brett.

21       Q     With your son?

22       A     Right.

23       Q     Why did you feel like he needed to be

24  hospitalized?

25       A     I didn't think he needed to be

Farganis

hospitalized. I just wanted to get him looked at to

make sure that everything was okay.

Q    To be safe?

A    Right.

Q    But you didn't see any overt signs?

A    No.

Q    That he needed hospitalization or even

medical care, you wanted to be safe?

A    Right.

Q    Where was your niece? How far was she that

she was asking to be picked up?

A    She was probably five miles away at her

girlfriend's house.

Q    In the direction of the hospital or out of

the direction of the hospital?

A    In the direction of the hospital.

Q    Okay. Did your niece drive, by the way?

A    She did not have a vehicle.

Q    How about mom or dad, your mom or dad?

A    Well, she was at her friend's house so I

wanted to stop there to pick her up.

Q    Who was at her friend's house?

A    Jessica.

Q    Understood. What about your mom and dad,

Farganis

was driving?  Was he driving or were you driving?

A     He was driving.

Q     Okay.  He also drove his car with you and your car to the shop to get the car fixed, right?

A     Right.

Q     So, your dad can drive a car?

A     Right.

Q     In fact, your father can drive a car with child car seats in the car?

A     Right.

Q     But you chose not to call your father?

A     Right.

Q     Is it fair to say that you knew if you called your dad he would have come or at the very least given a car seat?

A     My father watches my other nieces and nephews.  So, he had two of them with him that day also.

Q     You knew that for a fact?

A     Yes.

Q     How about your mom?

A     My mother doesn't drive.

Q     Okay.  All right.  Did you drive the five miles and arrive at Jessica's location?

Farganis

1    next?

2

3    A    He asked me if I was drinking and I told

4    him, no.

5    Q    Okay.

6    A    He told me that I had to do a field

7    sobriety test.

8    Q    Do you know what that is?

9    A    Yes.

10   Q    What is that?

11   A    That is when they want you to walk a line

12   or do something.

13   Q    What's the purpose of the test?

14   A    To prove you are not drunk.

15   Q    To see what your level of intoxication is?

16   A    Right.

17   Q    And given the information that he received,

18   the 911 call about the fact that you might have been

19   drinking and your son fell out of the car, you would

20   agree now that was not an unreasonable thing to do?

21        MR. BERGSTEIN:   Objection.

22   Q    Would you agree that that was not an

23   unreasonable thing to do?

24        MR. BERGSTEIN:   Same objection.   You can

25        answer.

                              Farganis

A    Would I agree that that was not?

Q    Would you agree that that was not an
unreasonable thing to do?

A    Yes.

Q    Okay.  Now, were you given those field
sobriety tests?

A    Yes.

Q    What field sobriety tests were you given?

A    I had to put my head back.  Close my eyes.

Q    Touch your nose?

A    Yes.

Q    Did you pass that test or fail that test?

A    Failed.

Q    Okay.  Why did you fail that test?

A    My balance is off.

Q    And that's as a result of?

A    Of the M.S.

Q    Of the M.S., okay.

A    I had explained this to him.

Q    Well, tell me when during the conversation
you explained that to him.

A    Before he had me do it I told him I would
not be able to do that because of my M.S. because my
balance is off, because my coordination is off.

Farganis

Q    Okay, you would agree that if you were intoxicated it's possible that your balance would also be off?

A    Yes.

Q    And your coordination would also be off?

MR. BERGSTEIN:  Objection.  You can answer.

A    Right.

Q    And your speech would also be slurred?

A    Yes.

Q    You would give certain indications that you were intoxicated, right?

A    Yes.

Q    Now, so you failed that test.  What other test did you fail -- withdrawn.  What other tests were you given?

A    None.

Q    What happened after the field sobriety tests?

A    He instructed Officer Byrnes to arrest me.

Q    For what?

A    Endangering the welfare of a child.

Q    You were not arrested for any intoxicating or any intoxicative crime?

A    No.

1                    Farganis
2    the crime you committed?
3              MR. BERGSTEIN:  Objection.
4              MR. MOROKNEK:  What's the objection?
5              MR. BERGSTEIN:  She is not a lawyer.  She
6        doesn't know what crime she is guilty of having
7        committed.
8              MR. MOROKNEK:  She is charged with it.
9              MR. BERGSTEIN:  She is not going to admit
10       to committing a crime.  She can't admit if she
11       committed a crime or not.  It's up to the court.
12             MR. MOROKNEK:  I respectfully disagree with
13       you.
14       Q     The facts we talked about, you don't
15   dispute, you don't dispute or deny anything of that
16   happening?
17       A     Right.
18       Q     Okay.  After he told you, forgive me, after
19   Dennis Barnett asked Police Officer Byrnes to arrest
20   you for endangering the welfare of a child tell me
21   what happened.
22       A     They put the handcuffs on me and put me in
23   a police car.
24       Q     Do you know why you were being handcuffed?
25       A     No.

Farganis

you hear my question?  I want to know.

    A    Do I think it's fair?

    Q    No.

    A    Or reasonable?

    Q    Yes, given their policies and procedures.

         MR. BERGSTEIN:  If you know them.

         MR. MOROKNEK:  Well, as I just told them to
    you.

    A    Yeah.

    Q    After you were handcuffed, ma'am, were you
placed in the car?

    A    Yes.

    Q    Can you tell me, while this was going on
where it is that your son was?

    A    Sitting on the police car watching it all
happen.

    Q    Who was with him?

    A    Barnett.

    Q    Where was your niece?

    A    In her girlfriend's house.

    Q    She didn't come out of the house?

    A    Because she didn't want to get in trouble.

    Q    In trouble for what?

    A    For trying to find out any information.  Do

Farganis

you know the Town of Montgomery Police?  If you did,
you would understand.

    Q    Okay.  Did your niece come out of the
house?

    A    No.

    Q    And who was with your son?  I know you told
me this.  Who was with your son while you were being
arrested?

    A    Barnett.

    Q    Sergeant Barnett.  And what was happening
with your son?  Could you see what was going on over
there?

    A    I saw him on the hood of the police car.

    Q    And was he being treated medically at all?
What were they doing for him?

    A    Not at that time.

    Q    How were you behaving, by the way, at the
time while you were being arrested?  Were you
screaming, were you shouting, were you yelling, were
you saying nothing?

    A    My nerves were so shot my legs were
shaking.  I was just doing whatever I was told to do.

    Q    How were you speaking?  Was your speech
slurred?  Were you having problems expressing

1           Farganis

2    yourself and explaining?

3        A    I wasn't speaking.  I was crying.

4        Q    You were crying.  Okay, and generally

5    speaking, how would you say Officer Byrnes and

6    Sergeant Barnett treated you during this incident?

7        A    Well, Barnett told me that he was going to

8    -- he was an accident reconstructionist specialist.

9    I shouldn't be driving.  He was going to make sure my

10   license got taken away.  I told him my doctor never

11   told me not to drive.  He told me I was a liar.

12   Actually, he said I was a god damn liar.

13       Q    How about Officer Byrnes?

14       A    Officer Byrnes I don't recall saying

15   anything to me.  He was more or less just listening

16   to his superior.

17       Q    So, what is your claim as you sit here

18   today against Kenneth Byrnes?  It sounds to me like

19   he didn't really do anything to you.

20       A    He could have stopped Barnett.  He could

21   have told him what he was saying to me, what he was

22   doing to me wasn't right.

23       Q    What was he saying and doing to you?

24       A    Telling me that I should not be driving

25   because of the M.S.  He had a parking lot full of

1          Farganis

2   people staring at me, watching everything going on.

3   He was pretty much belittling me in front of

4   everybody.

5          Q     Was he belittling you?

6          A     I shouldn't be driving.  I was a god damn

7   liar when I told him my doctor never told me that I

8   couldn't drive.  He still to this day didn't tell me

9   that I can't drive.

10         Q     You want to take a minute, ma'am, and come

11  back?

12               MR. BERGSTEIN:  Let's take five.

13               MR. MOROKNEK:  That's a good idea, counsel.

14               (Whereupon, at this time, a brief recess

15      was taken.)

16         Q     Okay.  Can we agree that the person that

17  you claim was making these comments was Sergeant

18  Barnett?  Is that fair?

19         A     Yes.

20         Q     We can also agree that Kenneth Byrnes

21  didn't make any of these statements, right?

22         A     I didn't hear him say any.

23         Q     Okay.  Can we agree that in your opinion

24  the only thing Kenneth Byrnes did wrong here was not

25  stop Dennis Barnett?

Farganis

claim against him on that day?

A    I did not appreciate when I was in the
police station the way he was ranting and raving up
and down the aisle, whatever it was.

Q    You know what, I have a great idea.  Let's
get out of the scene of the arrest first.  You were
handcuffed and placed in a vehicle by Officer Byrnes?

MR. BERGSTEIN:  Right.

A    Yes.

Q    Okay.  While you are being handcuffed and
placed in the vehicle your son was on top of a police
car with Sergeant Barnett, right?

A    Now he is probably on the stretcher.  Okay,
what I don't understand is, why was he on the
stretcher still when I was being taken away in a
police car if it was so?

MR. BERGSTEIN:  He asks the questions.  You

don't have to ask questions.

Q    I want to know what you saw while you were
at the scene with regard to your son?  Tell me what
happened with regard to your son while you were being
arrested.

A    He was on the police car but then he was on
the stretcher and Barnett told Byrnes to take me over

1        Farganis

2    to him on the stretcher to try to calm him down

3    because he was screaming for me.

4        Q    He was screaming?

5        A    For me.

6        Q    Okay.  So, are you saying that Sergeant

7    Barnett allowed Officer Byrnes to take you over to

8    your son?

9        A    Yes.

10       Q    Okay.  Were your handcuffs on or off at the

11   time?

12       A    He took them off.

13       Q    So, let me understand this then.  Sergeant

14   Barnett advised Officer Byrnes to arrest you for

15   endangering the welfare of a child, right, right?

16   You have to speak.

17       A    Yes.

18       Q    Okay.  At that point Kenneth Byrnes placed

19   you in handcuffs and put you in the car?

20       A    Correct.

21       Q    Is it fair to say that Dennis Barnett,

22   Sergeant Barnett saw that your child was upset and

23   told Officer Byrnes to take you out of the car,

24   unhandcuff you, right, take the handcuffs off of you

25   and let you go over to be with your son?

1                    Farganis

2        A    I don't know if Barnett told him to take

3    the handcuffs off of me or if Byrnes asked him if he

4    could take the handcuffs off of me to take me to my

5    son.  They were taken off.

6        Q    You were taken out of the car?  Were you

7    helped out of the car?

8        A    Yes.

9        Q    And then your handcuffs were taken off,

10   yes?

11       A    Yes.

12       Q    And then you walked over to your son?

13       A    Yes.

14       Q    Okay.  How much time did you spend with

15   your son while you were over there?

16       A    Oh, maybe a minute, if that.

17       Q    Was it long enough to get him to calm down?

18       A    No.

19       Q    Was it long enough to hug him and tell him

20   it will be okay?

21       A    Yes.

22       Q    Explain to him what was going on?

23       A    Yes.

24       Q    And did you explain to him what was going

25   on?

1        Farganis

2        Q      When you say he questioned your son, where

3    did that questioning take place?

4        A      At the hospital.

5        Q      Okay.  What kinds of questions did he ask

6    your son?

7        A      He asked him what happened, if he was in a

8    car seat, if he was in a seat belt, who was driving.

9        Q      You know all the answers to those

10   questions, right?

11       A      Yeah, but I don't think a five year old --

12       Q      Is he five or six?

13       A      Five.  He is seven now but he was five when

14   it happened.

15       Q      Okay.  How long were you in the police

16   station that night?

17       A      Four hours.

18       Q      Tell me what happened.  First of all, who

19   drove you to the police station?

20       A      Byrnes.

21       Q      Did you have any conversation with Byrnes

22   en route to the police station?

23       A      Yes, I told him, you guys don't know what I

24   was doing.  I was going to get my niece to go with me

25   to take him to Horton Hospital because I cannot walk

Farganis

in there by myself with him.

    Q    Why couldn't you walk in there by yourself with him?

    A    Because I was having difficulty walking.

    Q    Okay.

    A    And he told me that didn't matter because I didn't call the ambulance when it happened.

    Q    Okay. You will agree whether that's the case or not, the fact of the matter is you didn't put your kid in a child seat, right? We agree with that?

    A    Yes.

    Q    And your child fell out of the car because he got out of the seat belt?

    A    Right.

    Q    Right?

    A    Right.

    Q    So, that's why you were being arrested, right?

    MR. BERGSTEIN: Objection. You can answer.

    Q    Well, let me ask you a question.

    MR. MOROKNEK: Can you mark that Defendant's Exhibit B for identification?

    (Whereupon, a complaint was marked Defendant's Exhibit B for identification, as of

1                         Farganis

2       A      Dr. Higgins, H-I-G-G-I-N-S.

3       Q    ' Great.  Where is he located?

4       A      In Wallkill.

5       Q      Okay, good.  When was the last time your

6  son saw Dr. Higgins?

7       A      In 2004.

8       Q      Did there come a time you got to the police

9  station?

10      A      Yes.

11      Q      What happened once you got to the police

12  station?  You were removed from the car?

13      A      Yes.

14      Q      Taken out of the car?

15      A      Yes, taken into the police station, yes.

16      Q      Tell me what happened.

17      A      I was put on the bench, handcuffed to the

18  bench.

19      Q      Okay.

20      A      And Barnett just went up and down the aisle

21  ranting and raving and was going to make sure my

22  license got taken away.  I should not be driving.  He

23  was going to the DA to get my license taken away.

24      Q      Did he say he was going to the DA to get

25  your license taken away?

Farganis

A     Yes.

Q     Hear what I have to say before you answer
my question because you don't know what my question
is.  Right, right?

A     Right.

Q     Or did he say he was going to go to the DA
and ask them to make a determination as to whether
you should have a license at all, whether it should
be a conditional license or whether there should be
some restriction on your license?

A     No, he said he was getting my license taken
away.  I shouldn't be driving.

Q     He thought you should get your license
taken away?

A     Yes.

Q     That was a problem for you?

A     Yes.

Q     Why?

A     Because my doctor never told me I couldn't
drive.

Q     Did he say it had to do with your M.S.?

A     Yes.

Q     Or did he say it was as a result of what
you did with your child in the car?

Farganis

A    Because I have M.S.  I should not be
driving.  He is an accident reconstructionist
specialist.  People like me should not be driving.

Q    You keep saying, he is an accident
reconstructionist specialist.

MR. BERGSTEIN:  Let him finish the
question.

Q    What does that have to do with anything?
When did he tell you that?

A    When we were in the police station I told
him -- I didn't tell him anything.  He just told me
because I had M.S., he is an accident
reconstructionist specialist.  I shouldn't be
driving.  Those were his exact words.  I told him my
doctor never told me that I could not drive.  I went
to Helen Hayes Hospital to see a doctor.  I went to
Dr. Nasir, three different neurologists.  Nobody ever
told me that I couldn't drive.

Q    All right.  Let me ask you this, you will
agree that a person with M.S. like yourself is not
stopped right because of that condition?  You are not
stopped from putting your kid in a child seat?

A    Right.

Q    You are not stopped from putting your kid

                    Farganis

embarrassment you sustained.

     A     No.

     Q     Did you ever talk to the press about this
incident?

     A     Yes.

     Q     You did?

     A     Yes.

     Q     What did you tell them?

     A     They wanted to ask me questions about what
happened to end. I told them, how Barnett made me
feel like I shouldn't be driving. I told them how he
made me feel as a person with M.S. He belittled me
and he just made me feel like a no good mother. I
shouldn't be a mother. That's how he made me feel.

     Q     Since this incident, ma'am, have you sought
mental healthcare or counseling of any kind?

     A     Since this incident, I have been put on
Zoloft for my depression.

     Q     What doctor did that, ma'am?

     A     Dr. Nasir.

     Q     What kind of doctor is Dr. Nasir?

     A     He is a neurologist.

     Q     Why is Dr. Nasir prescribing Zoloft for
you?

Farganis

told me that you learned something. You don't go out
with your kid in the car unless he has a car seat.
How has it changed your life? What things can't you
can't you do as a result of this incident?

    A    Well, what can't I do?

    Q    Yes.

    A    Let's see, I can't go to my dad's house.
Another reason why we got rid of the van is because
we were coming home from my dad's house and we were
being followed by a Town of Montgomery cop when we
were driving the van. I don't know who was in the
police car but that's why we got rid of the van and
we got two other cars. I don't know when they are
going to appear, when they are not.

    Q    You don't know when they are what?

    A    They are going to appear. We have an alarm
in the house. When I hear the alarm go off, I jump.

    Q    Why?

    A    Because of the sirens at the police, the
police with the sirens at Mike's Deli. I can't hear
a siren because it makes me jump. My niece saw that
a week after this happened. She told me she can't
believe what it did to me. My husband sees it every
time we hear sirens going by the house.

Farganis

Q You didn't mention earlier when I asked you about the scene of the arrest that the police had the sirens and lights on. Is that the case?

A Yes.

Q The sirens and lights were on?

A Yes.

Q Now, it's your claim when you see sirens, when you hear sirens, you don't see them, you hear them that it upsets you?

A Yeah, it makes me nervous.

Q Okay.

A It makes me nervous to see a police car drive by me.

Q You told me earlier that the reason you got rid of the van was because of the transmission.

A That was one of the reasons. Like I said, the other reason was because we are driving it and we get followed by the Town of Montgomery Police.

Q How many times have you been followed by the Town of Montgomery Police since this incident?

A We only got followed probably once because we got rid of the van shortly after this happened.

Q How do you know the police were following you and not just going in the same direction as you

Farganis

Q    Okay.

A    I have to stay out of the heat because the heat just makes it worse.

Q    I just want to make sure I am clear on this and then I am finished. You said that you believed your M.S. got worse for three days and then it was back to where it was before the incident. Is that fair to say?

A    Not back to where it was before. It got worse a little bit. It's probably to the point where I am now.

Q    I am not sure what that means. It got worse for a little bit for about three days. After the third day what happened?

A    It just stayed the way it is.

Q    So, do you claim that Officer Barnett or Sergeant Barnett's behavior actually caused your M.S. to get worse?

A    I believe it caused an exacerbation, yes.

Q    And has Dr. Nasir agreed with that?

A    Yes.

Q    Really, okay. All right. I thank you.

MR. BERGSTEIN: I have just a quick follow-up.

Farganis

EXAMINATION

BY MR. BERGSTEIN:

    Q     Have you lost sleep because of this?

    A     Yes.

    Q     How much, rough estimate?

    A     I would say anywhere between, I guess, you can say I still lose sleep over it because I have nightmares every now and then.

    Q     Do you cry to this day as a result of this?

    A     Yes.

    Q     Other than the crying today during the deposition?

    A     Yes.

    Q     How often?

    A     Whenever it's brought up to me.

    Q     Approximately how often is that?

    A     I would probably say once a month.

    Q     All right, that's it.

         (Continued on next page so

        that jurat does not stand alone.)