2.  The carrying of large, folding or sheath-type knives by members while on-duty is prohibited.

## E.    Leather Equipment

All leather uniform equipment shall be polished including shoes

## F.    Winter Attire

The jacket or winter coat shall be worn during the winter months. No decorations, medals or pins shall be worn on the winter coat except issue nameplates.

## G.    Summer Attire

Short-sleeve uniform shirts may be worn as prescribed by the Chief with appropriate consideration given to area weather conditions.

1.  When worn under an outer issue garment, a necktie and tie clasp must be worn. The raincoat is not to be considered an outer garment.

2.  When worn without an outer issue garment, a necktie and tie clasp need not be worn; in this case the topmost button must be open at the neck. Undergarments must not be visible. The short-sleeve uniform shirt may be worn with a necktie and tie clasp for court appearances, hearings, speeches and other similar assignments and Members are encouraged to do so.

## H.    Accountability

A member is accountable for all uniform clothing, associated equipment, and other items of authorized equipment issued or supplied to him as recorded on his Accountability Record. All members shall return department issued equipment upon termination and/or resignation from the Department.

## ARTICLE X — OUTSIDE WORK OR GAINFUL OCCUPATION

## A.    Policy

Except for an occasional investment in real property or securities or a sale of a house, motor vehicle or other personal property not performed in the course of a business, the term outside work or gainful occupational means the rendering of any service or the sale of anything for pay or remuneration from any source other than the Town of Montgomery or

participation in any activity for which such pay or remuneration is received.

**B.    Restrictions**

The following restrictions govern the granting of approval to engage in outside work or gainful occupation:

1.    The number of hours to be worked by full time police officers must not exceed 20 hours in any one-calendar week.

2.    The outside work or gainful occupation must not interfere with a member's scheduled Duty or overtime duty or availability for emergency or other recall to duty. Even though approval to engage in outside work or gainful occupation is granted to a member, if assigned to work overtime or recalled to duty, that member must work that overtime or recall overtime.

3.    No member may engage in outside work or gainful occupation:

    •    When on Sick Leave or Personal Leave; or

    •    When absent from duty because of disability.

4.    In preparing work schedules, a member engaging in outside work or gainful occupation must not be granted any special consideration.

**C.    Prohibited Acts or Actions**

All of the following acts or actions are prohibited:

1.    Engaging in any activity directly or indirectly related to outside work or gainful occupation while on duty;
2.    Wearing the Town of Montgomery uniform, in whole or in part, while engaged in outside work or gainful occupation;
3.    Using any item of Town of Montgomery Police Department equipment while engaged in out work or gainful occupation;
4.    Using a Town of Montgomery Vehicle for transportation to or from any outside work or gainful occupation; or using a Town of Montgomery Vehicle in the performance of outside work or gainful occupation.

**D.    Kinds of Prohibited Employment**

1.    Employment Forbidden by Law

The law forbids police officers to engage in certain activities or employment. You are legally forbidden to engage in the following:

(a)    Any activity or employment that is associated with harness racing or parimutuel racing (Racing, Pari-Mutual Wagering and Breeding Law § 107)

(b)    Any activity or employment that requires direct or indirect interest in the manufacture or sale of alcoholic beverages.

2.    Employment In Conflict With Or Opposed To A Member's Duties

Certain kinds of employment, by their very nature, conflict with a member's law enforcement duties and responsibilities. Irrespective of whether there exists a true conflict or whether the public misconstrues such kinds of employment as being in conflict with a member's law enforcement duties and responsibilities, a member may not engage in activities associated with such employment. The following are examples of such activities:

(a)    Tow Truck Operator;
(b)    Commercial driving school instructor;
(c)    Ambulance driver;
(d)    Insurance adjuster (whether motor vehicle or other);
(e)    Work in any motor vehicle service station or repair business; that is a licensed motor vehicle inspection station; or that repairs or services Town of Montgomery vehicles
(f)    Work as an attorney or paralegal where such work may conflict with the duties a police officer in the Town of Montgomery.

3.    Dangerous Employment:  Outside work or gainful occupation that exposes a member to an unusual risk of injury or death is prohibited.

E.    **Requesting Approval**

Two weeks before your employment is expected to start, prepare a memorandum in detail explaining the occupation and times of employment.

The Chief of Police or designated representative may withhold or revoke approval

to engage in outside work or gainful occupation when this is in the best interest of the Department. Nevertheless, the Chief or designated representative, in his/her sole discretion may approve of a member engaging in some kind of outside work or gainful occupation that is prohibited by this Policy when he considers it to be consistent with the best interests of the Department.

When a member receives approval to engage in outside work or gainful occupation, the approval is granted solely for the specific work description, employer and conditions of employment as specified in the request. Each time the work description, employer or work conditions change, a new approval request must be submitted and the previous request must be withdrawn.

## ARTICLE XI —DISCIPLINARY PROCEDURES

### A.    PURPOSE

Discipline within the Town of Montgomery Police Department requires that all members of this organization conform to a code of ethics and standards of performance supported by a system of authoritative guidelines such as rules, regulations, general orders and other policies or procedures. Discipline is a necessary element in the maintenance and growth of any officer or employee within the department. Any violation of these rules and regulations or general or specific duties may subject the police officer to disciplinary action up to and including termination of employment

### B.    POLICY AND RESPONSIBILITY

1.    Departmental Supervisors

a.    All departmental supervisors are responsible to insure that all members of the Police Department perform their duties in accordance with the policies, procedures, rules and regulations, and authoritative instructions of the department.

b.    Supervisors shall recommend, through the chain of command, to the Chief of Police the preparation of formal departmental charges.

c.    Should a supervisor feel that an officer or employee is unfit for duty (for either medical or psychological reasons), they may excuse that member for the remainder of their tour.

d.    When it is indicated that the possession of a firearm or other equipment by a police officer could be dangerous to themselves or others, said equipment will be secured from that officer by their

immediate commanding officer. However, under extreme circumstances where the member's mental state is such that, in the observer's opinion, the member is in imminent danger of seriously injuring themselves or others, any member of the department may secure such equipment. The member's supervisor will then immediately notify the Chief of Police of the action taken immediately and will then file a written report of their action within 24 hours.

e.    Medical or psychiatric examination may be ordered pursuant to Section 72 of the Civil Service Law which provides that if the individual is found to be mentally or physically unfit to perform the duties of the position held, then the Chief of Police or the appointing authority may place that member on involuntary leave.

2.    The Chief of Police

a.    The Chief of Police will suspend from duty any member(s) of the department who have been arrested and charged with a crime or who have been indicted by a grand jury.

b.    The Chief will then institute an investigation into the matter and report to the Town Board as directed for their consideration as to the length of the member's suspension and determination if the suspension will be with or without pay.

c.    The Chief of Police will prefer, prepare, and forward to the Town Board as directed any charges and/or specifications against member(s) of the department for violations of the department rules and regulations, policies, procedures and authoritative instructions.

d.    The Chief of Police will also provide in writing a copy of all charges and specifications to the member(s) involved in person or by certified mail.

## C.    DISCIPLINARY PROCEDURE

1.    Receiving complaints

a.    Complaints against member(s) of the Police Department for violations of these rules and regulations or for violations of established policies, procedures, authoritative instructions or any law

shall be reported in writing addressed to the Chief of Police and/or the Town Board.

b.   Subordinates receiving complaints regarding member(s) of the department, whether in writing, in person, or by telephone, shall immediately notify their supervisor.

c.   In the event no supervisor is readily available then the subordinate will obtain all the necessary information and will turn it over to a supervisor as soon as possible.

d.   Any member of the department who may become aware of any violation of law, ordinance, rule or order of the department, by any member, shall immediately report such conduct to their immediate supervisor.

2.   Investigation of Complaints by Supervisors

a.   A supervisor or the Chief of Police, receiving information, or having knowledge, concerning the misconduct of a member(s), shall promptly begin an investigation of the matter. The supervisor shall reduce to writing, in affidavit form, any statements of the complainant, exactly as stated, paying particular attention to obtaining the names, addresses, and telephone numbers of all witnesses. The statement shall be properly sworn to by the complainant.

b.   A supervisor shall not investigate complaints against themselves or another supervisor of equal rank unless ordered to do so by the Chief of Police.

c.   After completion of the investigation, the supervisor shall submit to the Chief of Police a full report of the results of the investigation along with any recommendations they may have for further action.

d.   Charges shall not be recommended unless there is reason to believe that an offense has been committed, and that the facts, standing uncontroverted, establish the validity of the charge or charges.

3.   Disciplinary Action

a.   No regularly employed member of the Police Department who has completed his probationary period, shall be removed, reduced in rank,

September 1, 2000

suspended, fined, or otherwise punished or disciplined except upon charges as provided pursuant to Town Law Section 155 or other applicable law.

b. Whenever any action other than the preferment of charges is taken by a supervisor, a complete report of the incident shall be filed with the Chief of Police and will be made part of the member's personnel file.

c. In the absence of a superior officer, the supervisor in charge of a shift shall have the authority to impose an emergency suspension from duty against a subordinate when it appears that such action would be in the best interest of the department. That supervisor imposing the suspension and the subordinate receiving the emergency suspension will report to the Chief of Police at 9:00 a.m. on the next day unless otherwise directed.

4. Surrender of badge, weapons and equipment

a. Any member, upon being suspended, shall surrender to his supervisor any badges, handcuffs, batons, and all department weapons they possess. The supervisor will provide a receipt for said equipment.

b. The supervisor shall then insure that the member's property is then properly safeguarded and returned to the member upon termination of the suspension.

c. Members shall not wear their uniform during the period of their suspension.

5. Preparation of Charges

Charges shall be preferred in accordance with the Town Law and any other applicable statutes. Answers to disciplinary charges shall be made in accordance with applicable law. After service of the charges, the police officer may be suspended in accordance with applicable law.

6. The Hearing

a. Place of Hearing

1. Hearings of accused members shall be in a location designated by the Town Board.

33

      b.     Designation of Hearing Officer

            1.     Town Law Section 155 provides that the Town Board may adopt and make rules and regulations concerning the discipline of Town police officers

                  (a)    The Town board, may in its discretion, designate in writing a hearing officer. This written designation shall be kept on file with the record of the proceeding.

                  (b)    The person designated to be the hearing officer need not be a deputy or subordinate employee of the Town. The Town board may, in its discretion, employ someone not connected with the Police Department or the Town to act as the hearing officer.

            2.     The Town Board, when they have designated another to be the hearing officer, shall, for the purpose of the hearing, vest all powers of the Town Board in that person. A record of such hearing, and all recommendations of the hearing officer, shall be referred to the Town Board for their review and decision.

      c.     Rights of the Accused

            1.     Right to be present at the hearing

            2.     Right to be heard in person and/or by counsel and to give and/or furnish evidence in their defense

            3.     Right to a hearing open to the public

   7.     The Determination

          The hearing officer or board after closing the hearing shall issue a decision and recommendation in writing shall be forwarded to appointing authority for final determination

   8.     Punishment

      a.     If the accused member(s) or employee is found guilty of the charges,

34

the penalty or punishment may consist of:

1.   A reprimand,

2.   Forfeiture and withholding of salary or compensation for a specified time not exceeding twenty days,

3.   Extra tours or hours of duty during a specified period not exceeding twenty days,

4.   Suspension from duty for a specified time not exceeding twenty days and the withholding of salary or compensation during such suspension,

5.   Or dismissal from the Police Department

## ARTICLE XII — POLICY AGAINST SEXUAL HARASSMENT AND OTHER FORMS OF HARASSMENT

## BACKGROUND

The Town of Montgomery hereby implements this policy of protecting and safeguarding the rights and opportunities of all people to seek, obtain, and hold employment in an environment free of sexual harassment in the workplace. In addition, all other forms of harassment, *e.g.*, racial, age, national origin, religious, etc. are prohibited.

## SEXUAL HARASSMENT POLICY

Sexual harassment in the workplace is illegal and all employees are forbidden from engaging in such activity in any manner. The Town is committed to providing a work environment free from all forms of sexual harassment or intimidation.

a.   This policy applies to all applicants and employees, whether related to conduct engaged in by an employee or someone not directly connected to the Town (e.g., outside vendors, consultants, customers, contractors).

b.   This sexual harassment policy includes, but is not limited to, inappropriate forms of behavior described below under the Definition of Sexual Harassment.

c.   To assure compliance with this policy, supervisors and managerial personnel must take timely and appropriate corrective action when instances of sexual harassment or other forms of harassment come to their attention.

d.  In accordance with applicable law  appropriate disciplinary action, which may include termination, will be taken against any individual who violates this policy.

e.  All employees shall refrain from prohibited conduct.

f.  Retaliation against any individual because he or she has filed a discrimination or harassment complaint is illegal and will result in disciplinary action in accordance with applicable law. Intimidation, coercion, threats, reprisals or discrimination against any individual resulting from the filing of a complaint under this policy are prohibited.

## DEFINITION OF SEXUAL HARASSMENT

1.  Sexual advances that are unwelcome, requests for sexual favors, and other unwelcome verbal or physical conduct of a sexual nature constitute sexual harassment when:

    A.  Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; -OR-

    B.  Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual, such as promotion, transfer, or termination; -OR-

    C.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

2.  Sexual harassment refers to behavior that is not welcome; that is, or would be, offensive to a person of reasonable sensitivity and sensibilities; that fails to respect the rights of another; and that, therefore, unreasonably interferes with an employee's work performance and effectiveness, or creates an intimidating, hostile or offensive working environment. It makes no difference if the harassment is "just joking" or "teasing" or "playful." Such conduct may be just as offensive as any other type of harassment.

    Specific forms of behavior that may constitute sexual harassment include, but are not limited to, the following:

    A.  VERBAL:

36

Explicit or implicit threats of retribution, or promises of benefits, in return for sexual favors.

Abusive language related to an employee's sex or sexual preference, including sexual innuendoes, slurs, suggestive, derogatory or insulting comments or sounds, whistling, jokes of a sexual nature or concerning gender-specific traits, sexual propositions and threats.

Use of demeaning or offensive words when referring to a particular sex or sexual preference.

Demands for sexual favors or sexually oriented comments about an employee's body or appearance, sexual habits, sexual preference, or sexual desirability that are unwelcome and unreasonably interfere with an employee's work performance by creating an intimidating, hostile, or offensive working environment.

B.    NONVERBAL:

Sexual harassment is not limited to oral comments. Abusive written language, showing or displaying pornographic or sexually explicit objects or pictures, graphic commentaries or obscene gestures in the workplace, which unreasonably interferes with an employee's work performance or creates an intimidating, hostile, or offensive working environment, are also prohibited.

C.    PHYSICAL:

Any sexual advance involving physical contact that is not welcome, including touching, petting, pinching, coerced sexual intercourse, or assault.

## OTHER FORMS OF PROHIBITED HARASSMENT

Just as sexual harassment is strictly prohibited, so is harassment on the basis of race, color, religion, creed, national origin, citizenship, age, disability, pregnancy, marital status, veteran status, or any other status protected by law. The Town if Montgomery is committed to providing a work environment free from all forms of prohibited harassment or intimidation.

September 1, 2000

Definition of Prohibited Harassment:

1.    Verbal or physical conduct constitutes prohibited harassment when:

   A.    It is based on an applicant or employee's race, color, religion, creed, national origin, citizenship, sex, age, disability, pregnancy, marital status, veteran status or other protected status; -AND-

   B.    Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

2.    Prohibited harassment refers to behavior that is based on a protected classification; that is not welcome; that is, or would be, offensive to a person of reasonable sensitivity and sensibilities; that fails to respect the rights of another; and that, therefore, unreasonably interferes with an employee's work performance and effectiveness, or creates an intimidating, hostile or offensive working environment. It makes no difference if the harassment is "just joking" or "teasing" or "playful." Such conduct may be just as offensive as any other type of harassment.

   Specific forms of behavior that may constitute prohibited harassment include, but are not limited to, the following:

   Abusive language related to an employee's race, color, religion, creed, national origin, citizenship, sex, age, disability, pregnancy, marital status, veteran status or other protected status, including innuendoes, slurs, suggestive, derogatory or insulting comments or sounds, threats, and jokes based on the employee's protected status.

   Use of demeaning or offensive words when referring to an employee's race, color, religion, creed, national origin, citizenship, sex, age, disability, pregnancy, marital status, veteran status or other protected status.

   Prohibited harassment is not limited to oral comments. Abusive written language, transmitted via E-mail or otherwise, showing or displaying offensive objects or pictures, graphic commentaries or gestures in the workplace, which unreasonably interferes with an employee's work performance or creates an intimidating, hostile, or offensive working environment, are also prohibited.

   Any physical contact based on an employee's race, color, religion, creed, national origin, citizenship, sex, age, disability, pregnancy, marital status,

38

veteran status or other protected status that is not welcome.

## PROCEDURE

1. Any person who feels that he or she has been the victim of sexual harassment or other form of harassment is required to immediately report the incident to the Chief of Police, Supervisor, or Town Clerk. Any person who has witnessed such conduct is also encouraged to report it to a Town Board Member.

2. All complaints will be investigated in a timely manner.

3. Confidentiality will be maintained to the maximum extent possible, consistent with the Town's obligation to conduct a thorough investigation. All individuals who become involved in the investigation are required and directed to treat the matter confidentially, and a violation of this directive will, in itself, be grounds for disciplinary action in accordance with applicable law. Documentation of the investigation will be confidential to the maximum extent consistent with law and kept in a separate file.

4. Investigation of a complaint will normally include conferring with the parties involved and any named or apparent witnesses. The particular facts of the allegation will be examined individually, with a focus upon the nature of the behavior, the pattern of such conduct, if any, and the context in which the incident(s) occurred. Those employees entitled to representation pursuant to Civil Service Law shall be entitled to representation pursuant to Civil Service Law where applicable.

5. Notice of the complaint shall be given to the accused prior to the questioning of the accused. The accused shall be afforded an opportunity to present his/her version of events in the presence of a union representative or attorney where required by law.

6. Both the complainant and the accused will be given confidential written notice of the results of the investigation.

7. Anyone who participates in this procedure may do so without fear of retaliation. Retaliation against anyone because he or she has filed a harassment complaint or is a witness in a harassment complaint is illegal and grounds for disciplinary action.

8. An individual who is found to have committed an act of sexual harassment will be subject to appropriate disciplinary action in accordance with applicable law up to and including termination.

9    Follow-up interview(s) with the complainant will be conducted for an appropriate period of time, to ensure that the harassment has not resumed and that no retaliatory action has been taken.

## HARASSMENT COMPLAINT PROCEDURE

STEP ONE

A.    An individual who believes that the Town of Montgomery Anti-Harassment Policies have been violated shall file a complaint with the Town Supervisor or Town Clerk. Any complaints against the Town Clerk or Town Board Member may be filed with the Supervisor. It is strongly encouraged that an employee file a written complaint (Form A).

B.    All complaints shall be filed as promptly as possible after the complainant has concluded that the policy has been violated.

C.    All complaints of sexual harassment or other forms of harassment and the investigation of the complaint(s) are confidential to the maximum extent consistent with law and the Town's obligations to conduct a thorough investigation.

STEP TWO

A.    When a complaint is filed, the Town will commence a timely and thorough investigation.

B.    All individuals are hereby directed and required to cooperate with the Town in fulfilling its investigative function, in accordance with applicable laws.

C.    Notice of the complaint shall be given to the accused prior to the questioning of the accused. The accused shall be afforded an opportunity to present his or her version of events in the presence of a union representative or attorney where required by law.

D.    Both the complainant and the accused will be given written notice of the results of the investigation which shall be kept confidential to the maximum extent consistent with law until such time as disciplinary action, if any, is taken.

40

E.   If it is determined that sexual harassment or other form of harassment prohibited by Town policy has occurred, appropriate disciplinary action will be taken in accordance with applicable law.

F.   Follow-up interview(s) with the complainant will be conducted for an appropriate period of time, to ensure that the harassment has not resumed and that no retaliatory action has been taken.

41

September 1, 2000

## FORM A

Complaint of Harassment

Date of Complaint: _____
Date of Incident: _____
Complainant: _____
Charged Person(s) _____

Description of Incident: (Attach additional sheets if necessary)

_____

_____

_____

_____

_____

_____

Name(s) of witness(es), if any:_____

_____

Has the incident been reported before:_____

If yes, when, to whom, and what was the resolution?:_____

_____

_____
Complainant

Complaint Received by:_____

42

## ARTICLE XIII — RULES AND REGULATIONS FOR CHEMICAL TESTS

### A. PURPOSE

Rules and regulations governing chemical tests for evidence of intoxication as per the provisions of Section 1194(4)(c) of the Vehicle and Traffic Law and 10 NYCRR Part 59, as amended. These regulations may be amended from time to time as needed when there are changes in technology or procedures used in the administration of chemical tests.

### B. CHEMICAL ANALYSES OF BLOOD, URINE, BREATH OR SALIVA FOR ALCOHOLIC CONTENT

1. Definitions.

   a. Techniques or methods means the collection, processing and determination of the alcoholic content of body fluids such as human blood or urine as well as methods for the determination of the alcoholic content of breath or alveolar air by approved methods.

   b. Percentum by weight of alcohol as used in the Vehicle and Traffic Law shall mean percent weight per volume, that is, grams of alcohol per 100 milliliters of whole blood.

2. Methods and procedures in determining blood and urine alcohol.

   a. All blood and urine alcohol determination shall be made by quantitative methods and expressed in grams percent or as equivalent to grams of alcohol per one hundred milliliters of whole blood to the second decimal place found; for example, 0.137 percent found shall be reported as 0.13 percent.
      1. Three-fourths of the determined concentration of alcohol in the urine shall be equivalent to the corresponding whole blood alcohol concentration.
      2. Nine-tenths of the determined concentration of alcohol in the serum of plasma shall be equivalent to the corresponding whole blood alcohol concentration.

   b. Analytical procedures for blood alcohol analysis shall include the following controls in conjunction with any sample or series of 10 samples analyzed sequentially or simultaneously:
      1. A blank analysis where appropriate;
      2. Analysis of a suitable reference or control sample of known alcoholic content of greater than 0.08 grams per 100 milliliters, the result of

which analysis must agree with the reference sample value within the limits of plus or minus 0.01 grams per 100 milliliters or such limits as specified by the Commissioner of Health.

c.   The collection and handling of blood and urine specimens shall be accomplished as follows:

1.   No person except a physician, registered professional nurse, laboratory technician as classified by civil service or as registered by the American Association of Medical Technologists, or a medical technologist qualified under section 58-1.5 of Subpart 58-1 of Part 58 of this Chapter, and under the personal supervision and direction of physician, acting at the request of a police officer shall be entitled to withdraw blood for the purpose of determining the alcoholic content therein.

2.   All samples shall be collected within two hours of the time of arrest. An analysis of urine shall be made upon two specimens collected at least 30 minutes apart.

3.   An aqueous solution of nonvolatile antiseptic shall be used on the skin. Alcohol or phenol shall not be used as a skin antiseptic.

4.   Blood shall be drawn with a:

(a)   sterile dry needle into a vacuum container containing a solid anti-coagulant; or

(b)   sterile dry needle and syringe and deposited into a clean container containing a solid anti-coagulant, which container shall then be capped or stoppered, and identified.

3.   Blood and urine alcohol analysis; permits.

a.   Individuals performing chemical analysis for the alcoholic content of a person's blood or urine may apply to the State Commissioner of Health for a permit.

b.   A permit for the performance of chemical analysis for the alcoholic content of a person's blood shall be issued or reissued by the State Commissioner of Health to an individual who:

1.   Either is a high school graduate and has one year of laboratory experience acceptable to the State Commissioner of Health; or

2.   Has satisfactorily completed two years of advance study in a college or university and has six months of laboratory experience acceptable to the State Commissioner of Health.

3.   Establishes to the satisfaction of the State Commissioner of Health his competence to perform a chemical analysis of the alcoholic

44

September 1, 2000

content of blood and demonstrates to the State Commissioner of Health his continuing competence to perform such analysis.

4.   Has access to appropriate laboratory facilities.

c.   Competence shall be established and demonstrated in accordance with this section in the method of analysis to be used by the individual correctly analyzing and reporting, within limits established by the State Commissioner of Health, 75 percent of the specimens in each test submitted to the applicant by the State Commissioner of Health for blood alcohol analysis.

d.   A permit shall be issued for a period of one year and may be reissued for additional periods of one year each. A permit shall not be issued or reissued, or after issuance shall be withdrawn, if the results of two consecutive tests of specimens submitted to an individual:

1.   do not meet the competency requirements of this section;

2.   Are not returned; or

3.   Are returned more than three weeks from the date of shipment of test specimens by the department except that the State Commissioner of Health, for good reason, may extend such time on request made during such three week period.

4.   Breath testing instruments.

a.   Breath testing instruments must meet the following criteria:

1.   The quantity of breath analyzed for its alcoholic content shall be established only by direct volumetric measurement or by collection and analysis of a fixed breath volume.

2.   Breath specimens collected for analysis shall be essentially alveolar in composition.

3.   The instrument shall be capable of analyzing a suitable reference sample such as air equilibrated with a reference solution of known alcohol content at a known temperature, the result of which analysis must agree with the reference sample value within the limits of plus or minus 0.01 percent weight per volume, or such limits as set by the State Commissioner of Health.

4.   The specificity of the procedure shall be adequate and appropriate for the analyses of breath specimens for the determination of alcoholic concentration in traffic law enforcement.

b.   The director of an acceptable and/or approved laboratory may issue and maintain a list of instruments which meet the above criteria.

45

5.     Breath analysis; techniques or methods. Breath testing techniques and methods must meet the following criteria:

    a.     Breath samples shall be collected within two hours of the time of arrest and shall be analyzed with instruments meeting the criteria set forth in Section 2-4.

    b.     Continuous observation of the subject shall be maintained for at least 15 minutes prior to the collection of the breath specimen, during which period the subject must not have ingested alcoholic beverages or other fluids, regurgitated, vomited, eaten, or smoked or be allowed to place anything in his mouth; if the subject should regurgitate or vomit, an additional 15 minute waiting period is required.

    c.     A system purge must precede the testing of each subject.

    d.     The result of an analysis of a suitable reference sample, such as air equilibrated with a reference solution of alcoholic content of greater than 0.08 percent weight per volume at a known temperature, must agree with the reference sample value within the limits of plus or minus the State Commissioner of Health. This analysis shall immediately follow the analysis of the breath of the subject and shall be recorded.

    e.     Results of an analysis of breath for alcohol shall be expressed in terms of percent weight per volume, to the second decimal place as found; for example, 0.237 percent found shall be reported as 0.23 percent.

    f.     Proper and adequate records of operations, analyses, and results shall be maintained by each agency or laboratory using breath analysis instruments.

6.     Breath analysis permit programs. An application for approval of a breath testing program or a breath testing training program by the Bureau for Municipal Police of the Division of Criminal Justice Services and/or the Division of State Police shall be submitted to the State Commissioner of Health. Other agencies seeking approval of such programs shall submit their applications to the Bureau for Municipal Police of the Division of Criminal Justice Services. The application shall include:

    a.     a description of the techniques to be utilized;

    b.     the make and model of the instruments used;

    c.     an outline of the material presented in the breath analysis operator and

technical supervisor courses;

d.    the name of the individual primarily responsible for each training program and for the breath analysis program;

e.    the name and qualifications of one or more individuals meeting the requirements for technical supervisor under Section 2-9 of this Part; and

f.    such other information as the Commissioner of Health shall require.

7.    Breath analysis operator permits.

a.    A permit valid for two years will be issued by the State Commissioner of Health to breath analysis operators who have completed an approved program based upon standards acceptable to the State Commissioner of Health. The program shall consist of a minimum of 32 hours of instruction and training supervised by one or more individuals certified as technical supervisors and shall include:

1.    three hours of instruction on the effects of alcohol on the human body;
2.    five hours of instruction on operational principles of the selected testing method, including a functional description and a detailed operational description of the method with demonstration;
3.    five hours of instruction on the legal aspects of chemical tests generally, and of the particular method to be employed;
4.    three hours of instruction on supplemental information to include nomenclature appropriate to the field of chemical tests for alcohol;
5.    10 hours of laboratory participation using approved instruments and equilibrators, simulators or other reference standards;
6.    a passing grade on a one-hour formal examination; and
7.    demonstration of analytical proficiency on each instrument for which the operator is being certified.

b.    A permit valid for two years will be issued by the State Commissioner of Health for breath analysis operators certified to him by the approval agency (Bureau for Municipal Police and/or Division of State Police).

c.    A permit as a breath analysis operator will be renewed for two year periods if:
1.    The operator completes three hours of formal instruction in breath analysis under the technical supervisor and demonstrates analytical proficiency with the instrument for which renewal of certification is

47

requested; or

2. The operator submits a written declaration that he has performed six or more breath analysis tests during the preceding 24 months in accordance with Part 59 of this Chapter and every four years completes the retraining and proficiency exercise of paragraph (1) of subdivision (c) of this section.

8. Revocation or suspension of permits.

   a. The State Commissioner of Health or the approval agencies (Bureau for Municipal Police and/or Division of State Police, may at any time require their operators or technical supervisors to demonstrate their ability to properly operate the breath testing equipment for which they have a permit.

   b. The operator's permit may be revoked by the State Commissioner of Health based on information acquired by him, his approval agencies, or by the operator's technical supervisor, that the operator's performance is unreliable, or the operator is incompetent. If revoked, the operator shall return any and all permits to the State Commissioner of Health.

   c. The approval agency or the technical supervisor may suspend the permit of any operator under his supervision when, in his judgment, the operator's performance is unreliable or the operator is incompetent. The technical supervisor shall immediately notify the State Commissioner of Health in writing of any such suspension and furnish a copy of such notice to the suspended operator, who shall not be permitted to operate the instrument until such time as the suspension is removed.

   d. An operator whose permit has been suspended by action other than that of the State Commissioner of Health may appeal such action to the State Commissioner of Health who shall decide whether the action of his designee shall be affirm or set aside. The State Commissioner of Health may reinstate the permit of the operator making such appeal under such conditions as he may deem necessary.

   e. An operator whose permit has been revoked shall not be eligible for examination for a permit again within 12 months of the date of revocation or such other time as may be determined by the State Commissioner of Health.

9. Technical supervisor, qualifications and certification.

   a. Upon satisfactory proof through the approval agency (Bureau for Municipal

48

Police and/or, Division of State Police, to the State Commissioner of Health by the applicant that he meets the following qualifications, the State Commissioner of Health may authorize certification of such applicant as technical supervisor for a period of two years:

1. 30 semester hours of college credits including eight semester hours of chemistry;

2. certification as an operator of the chemical breath analysis method he is to supervise, or possession of equivalent experience or training to qualify him as an operator; and

3. satisfactory completion of a technical supervisor's course, the content of which shall include:

    (a) advanced survey of current information concerning alcohol and its effect on the human body (one hour);

    (b) operational principles and theories applicable to the program (two hours);

    (c) instrument maintenance and calibration (two hours);

    (e) legal aspects of chemical testing (one hour), and

    (f) training and experience equivalent to a technical supervisor's course acceptable to the State Commissioner of Health.

b. A technical supervisor's certification may be terminated by the State Commissioner of Health based on documented evidence that the technical supervisor's performance is not in keeping with the best interests of the breath alcohol testing program.

c. A technical supervisor shall have responsibility for:

1. supervision of breath analysis operators;

2. maintenance and calibration of breath testing equipment under his supervision;

3. field inspection;

4. training and reevaluation of breath analysis operators under his supervision;

5. periodic reexamination of operators under his supervision to ensure maintenance of technical knowledge and competence;

6. correctly preparing and standardizing chemicals used for testing; and/or checking the chemicals for testing; and

7. providing expert testimony concerning the breath testing instrument and the testing techniques supervised, when necessary.

d. A technical supervisor's certificate may be renewed for a period of two years upon submission of a written application stating that he has carried out his duties in accordance with this Part.

49

## XIV.  HIGH SPEED PURSUIT POLICY

### A.      INTRODUCTION

The purpose of this order is to clearly establish the policy as it concerns high-speed automobile pursuits.

What follows is a common sense approach to one of the most hazardous tasks which police must undertake. The main innovation, you will find, is the notion that it is no disgrace to break off a pursuit. Indeed, reasonable concern for your safety and the safety of the public often demands that the chase be aborted.

In a high-speed pursuit, the patrol car is potentially more dangerous than the service revolver. The risk involved must, always be weighed against the potential gain in initiating or continuing the chase. It is impossible to quantify this process for you. What can be done is to set out the factors which must be considered by you in arriving at reasonable decisions: we can, however, and will indicate when a high-speed chase is absolutely unjustified.

Much will depend upon your ability to remain relatively calm under conditions of stress and excitement. You must constantly evaluate and reevaluate changing conditions, make split second decisions involving serious consequences operate your red light and siren intelligently, use the radio to inform and be directed by communications, drive your patrol car with skill and urgency, and with all this, be mindful of public safety.

### B.      DEFINITION

A vehicle in pursuit is defined as an active attempt to stop a moving motor vehicle when the driver of such vehicle is aware of the attempt and is resisting apprehension by maintaining or increasing his speed or by ignoring the officer's attempt to stop him.

### C.      GENERAL CONSIDERATIONS

1.      It is the policy of the police that violators of the law be apprehended whenever it is feasible under the existing conditions. It is not expected, however, that a person be pursued to the point where the life of the officer, the violator, or others are placed in jeopardy. A high speed pursuit exposes the officer, the fleeing violator, pedestrians and passengers of other motor vehicles to the possibility of death or serious injury. Pursuits may also result in damage to personal property.

2.      After a pursuit is undertaken, officers should be prepared to, discontinue the pursuit if it becomes unreasonable under the circumstances to continue the

chase. Pursuits should not be continued through areas of heavy traffic congestion, through school zones where children are going to or from school, or in other situations where there exists an unreasonable risk of serious injury or death. When engaged in a pursuit, and when deciding whether the pursuit should be continued, officers should weigh the seriousness of the violator's suspected crime against the potential for death or injury if the chase is continued.

3. Officers must not assume that all persons who flee from the police and refuse to yield are felons. Experience has shown that most pursuits involve disorderly and motor vehicle violations only. Officers should also be aware that in the heat of a chase, the violator frequently refuses to give up and the officer likewise feels an obligation to succeed in the pursuit.

4. This psychological phenomenon can cloud an officer's judgement and may cause him to continue a chase beyond the point where common sense and good judgement would require the pursuit to be terminated.

## D. FACTORS TO BE CONSIDERED

1. Reason for the pursuit: An officer should have reasonable cause to initiate a pursuit and should not allow himself to be drawn into a high risk chase unless factors exist, such as reasonable suspicion that a violator has committed a serious crime, or such violator's driving becomes reckless, endangering motorists and pedestrians.

2. Changing conditions of the pursuit: Road, traffic and area conditions, intersections, the sudden appearance of a school zone, etc., can drastically change the nature of a pursuit. Even with the highest justification for pursuing, an officer should not do so under conditions that would expose the public to extreme or unreasonable risks.

An officer in pursuit must be aware of limitations imposed by changing conditions. His driving should be consistent with what is occurring, with his knowledge of the area, or lack thereof, and take into consideration the limitations of his car and his driving ability. It is essential to remain relatively calm, use good judgement and the knowledge and skills acquired.

## E. ALTERNATIVE ACTION

When a violator has too much lead time a pursuit should not be commenced. The officer would have to drive unreasonably fast to overtake the violator. This often happens when a speeder

is traveling in the opposite direction from the police car.

If the identity of the operator is known and his offense is not a grievous one, and his behavior is not endangering others, a high speed pursuit is not only needless, but unjustified. In such cases, a warrant for his arrest should be obtained.

Some examples where an officer should follow at reasonable speeds, rather than pursue:

        a. When hostages are involved, or

        b. The occupants of a vehicle are the subject of an alarm, are dangerous, and do not realize they have been recognized as wanted persons.

In such cases it is safer to follow rather than pursue, and by use of the radio, obtain necessary assistance for an interception at another location.

Dangerous occupants have been boxed in and apprehended when stopped for a red traffic signal light before they realized what was happening. This was accomplished by teamwork instead of premature use of red light and siren, which would alert the suspects and result in a high speed pursuit.

Discontinuing the pursuit: Discontinuing an intense pursuit that has progressed beyond the initial stage is the most crucial alternative to be considered. Excessive determination and excitement too often prevents even consideration of such action, though the risks involved outweigh the possible gains. The accident potential will build rapidly in any pursuit. Sustained pursuits often terminate with the crash of the car being chased. An officer should consider if he is pressing a pursuit too vigorously or unnecessarily. He must constantly evaluate changing traffic and road conditions, and if doubtful about his justification, he should discontinue the pursuit.

Discontinuing the pursuit does not mean giving up: The pursuit may be reestablished by the pursuing officer, or through the use of his radio, or by other police units.

DISCONTINUING A PURSUIT IS NOT A REFLECTION OF AN OFFICER'S ABILITY. IN MOST CASES, IF A PURSUIT CANNOT BE TERMINATED QUICKLY AND AT A REASONABLE SPEED, THE MOST INTELLIGENT ACTION FOR THE OFFICER IS TO DISCONTINUE IT. THIS IS A MATURE PROFESSIONAL APPROACH.

### F.    PUBLIC SAFETY

Whatever the circumstances of a pursuit, all considerations regarding justification and risks assumed should be geared to public safety.

While Section 1104 of the New York State Vehicle and Traffic Law allows a police vehicle

52

to exceed the Vehicle and Traffic Laws "when involved in an emergency operation," the operator has to be aware of his responsibility. Subdivision 4(e) states;

THE FOREGOING PROVISIONS SHALL NOT RELIEVE THE DRIVER OF AN AUTHORIZED EMERGENCY VEHICLE FROM THE DUTY TO DRIVE WITH DUE REGARD FOR THE SAFETY OF ALL PERSONS, NOR SHALL SUCH PROVISIONS PROTECT THE DRIVER FROM THE CONSEQUENCES OF HIS RECKLESS DISREGARD FOR THE SAFETY OF OTHERS.

Members are directed to thoroughly familiarize themselves with Section 1104 of the New York State Vehicle Traffic Law. Members are also reminded that "a member of the force or department shall operate a departmental vehicle in a careful and prudent manner." While Department Vehicle accidents are of considerable cost, what is infinitely more significant is the effect that personal injury from such accidents can have upon an individual member and his family.

## G.    CONTROL PROCEDURES

To avoid over-response, chaos and accidents, pursuits must be controlled by Communications. To be effective, this control procedure requires that we set a limit on the number of units in direct pursuit to one (1), and that the pursuing officer's use of the radio be precise and accurate. He should relay good information, listen to and be guided by the radio dispatcher. As soon as a pursuit develops, a communications supervisor shall take charge of, coordinate, and direct all aspects of any pursuit.

When entering a pursuit, notify Communications by verbally announcing, "car (number) in pursuit . . . location and direction of travel." If there is no prompt response from the radio dispatcher, repeat the message.

After acknowledgment by the radio dispatcher, follow instructions, speak in a normal voice and hold the microphone about two (2) inches from the lips. Remember the two second delay of the transmitter button. Give reason for the pursuit and the registration number of vehicle being pursued as soon as possible.

Announce direction of travel and approach areas (intersections landmarks) as frequently as safety permits. Bear in mind that your siren will make it harder for Communications to understand you.

Be prepared to switch frequency when requested by the radio dispatcher. Do not switch channels until directed.

Operators not engaged in the pursuit shall not join the pursuit unless assigned by a radio dispatcher. If a pursuit, is headed his/her way, an officer is more useful on his/her post than at the

tail end of the pursuit.

Operators who find themselves in an advantageous position adjacent to or ahead of a pursuit may assume a parallel course, at a reasonable speed, or after notifying the radio dispatcher set up an interception. See "road blocks."

If a one officer car is the pursuit vehicle, that vehicle should allow a two officer car to become the pursuit vehicle whenever conditions permit. A two officer vehicle is in a better position to transmit in a more easily understood manner, while the operator of the vehicle can concentrate on driving the pursuit vehicle without the distraction of having to use the radio. The original one officer car should take up an auxiliary function ready to render assistance and not continue the high speed pursuit unless assigned to do so by the radio dispatcher.

UNNECESSARY RADIO TRANSMISSIONS INTERFERE WITH PURSUIT TRANSMISSIONS AND MAY BLOCK OUT VITAL INFORMATION.

Road Blocks: Fixed road blocks, usually with little or no outlet, can result in fatalities and are almost never justified.

Partial Road Blocks are a form of interception used to slow down or divert a pursued vehicle and are desirable in that they can "wind down" a pursuit to a point where it can be more safely terminated.

Moving Road Blocks are usually used at very high speeds on straight, limited access roads and, under such conditions, are the only relatively safe form of road blocks that can be applied. Three (3) patrol units, well ahead of the pursuit and alerted by radio, can box in a car being chased in a manner that avoids or minimizes impacts and gradually slow it down to a stop. Such a method depends on the skill and teamwork of the officers involved, and is not without risks. Officers should be careful in choosing their location and, if conditions permit, consider the alternative of allowing the pursued vehicle to race on, until other conditions cause it to slow down, stop, or crash, or to where a moving road block can be more safely applied.

NO FORM OF ROAD BLOCK SHALL BE SET UP WITHOUT CONSIDERING THE SAFETY OF THE PUBLIC AND PURSUING OFFICERS: AND NOT UNTIL AFTER COMMUNICATIONS AND THE PURSUING OFFICER ARE NOTIFIED.

Control Procedure, Patrol Supervisor

The officer, upon initiating a pursuit shall contact his immediate supervisor, if available, by radio and advise of the pursuit. From that point on, the supervisor shall make the decision as to whether or not the pursuit should be continued. (This removes the decision from the police officer who is directly involved).

September 1, 2000

If close enough to respond effectively, a patrol supervisor will assist in a pursuit to whatever extent is practical. He/she would not normally attempt to overtake or interfere with the one unit in direct pursuit, but would be concerned with preventing excessive response or loss of control of the pursuit and with the apprehension of the subject(s), he would coordinate any pertinent action with Communications.

A patrol supervisor will also initiate an investigation of a pursuit, whether an accident results or not, whenever unusual circumstances, exceptional police performance, or knowledge of improper response exists. This investigation will include where appropriate, the performance of the Communications and other participating commands. Copies of all such reports shall be forwarded through official channels. Disciplinary procedure will be initiated whenever a member unreasonably fails to comply with Department policy as to responding without request; by exposing himself and the public to unjustifiable risks; failing to comply with the directives of a radio dispatcher, such as refusing to abandon pursuit, or return to post; or for any unilateral action (such as road block) taken, without notifying Communication, which jeopardizes others in the pursuit.

If the police supervisor cannot be contacted, the pursuit should be discontinued unless the officer has reason to believe the person or persons being pursued has committed a serious offense or are creating an unreasonable danger to the other users of the public highway. Also, the high speed pursuit should be discontinued even in these circumstances for any of the other reasons stated herein, such as where the violator has too much lead time, where the exact location is not known, etc.

## H. UNMARKED UNITS

An unmarked unit shall not engage in direct pursuit without the support of marked patrol units, except under conditions of extreme and immediate urgency. When a pursuing unit is not easily recognizable as a patrol car, the subject(s) of the pursuit, or motorists in the path of the pursuit, are likely to be confused and to react in an unpredictable and dangerous manner.

After radioing for marked patrol units to respond, an officer in an unmarked unit should follow but should attempt to do so unrecognized; or in such a manner as not to "push" a suspect. He/she would follow at high speeds only when justified in assuming direct pursuit without, waiting for the response or marked patrol units.

## I. FIREARMS

Firearms shall not be used in an attempt to stop a pursued vehicle. This applies to road blocks as well as pursuing units. Most officers realize it is ineffective, or if effective, extremely dangerous. A car traveling at a high speed, with a wounded or dead person at the controls, would be a worse situation than the pursuit.

## J. TERMINATION OF PURSUIT

55

When there is indication the pursued vehicle is about to stop or crash, operators of pursuing units should immediately drop back to give themselves enough stopping distance; and when choosing their final positions, they should consider traffic conditions and the possibility that the pursued vehicle may start up again, back up, or turn around.

Before exiting his/her car, the operator of the first pursuing unit should transmit, or know that another is transmitting, the exact location and a brief description of the occupant(s) and their vehicle. He/she should consider such occupant(s) to be dangerous, and should not attempt apprehension unless help is at the scene.

Operators of other police units should exit their cars in such manner as to "cover" the first officer's approach to the stopped vehicle, being especially careful not to place themselves in the line of fire between a fellow officer and the suspect(s). If available, one officer should remain with his unit to transmit via radio, conditions as they develop. He should, as soon as possible, inform Communications that, "the pursuit is terminated." Units not needed at the scene and units responding to the scene, other than a supervisor should return to post.